**UNITED STATES of America**

**v.**

**WALTER DUNLAP & SONS, INC.,**
**Appellant in 85–1671.**

**UNITED STATES of America**

**v.**

**NEW HOLLAND SALES STABLES,**
**INC., Appellant in 85–1673.**

Nos. 85–1671, 85–1673.

United States Court of Appeals,
Third Circuit.

Argued June 5, 1986.

Decided Sept. 12, 1986.

Rehearing and Rehearing En Banc
Denied Nov. 24, 1986.

See also, D.C., 619 F.Supp. 1162.

James T. Malysiak (argued), Freeman, Freeman & Salzman, P.C., Chicago, Ill., James A. Strazzella, Law Center, Philadelphia, Pa., E. Lawrence Oldfield, Chicago, Ill., for appellant Walter Dunlap & Sons, Inc.

James H. Thomas, Wenger, Byler & Thomas, Lancaster, Pa., for Holland Sales Stables, Inc.

Edward S.G. Dennis, Jr., U.S. Atty., Stanley Weinberg (argued), Asst. U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Philadelphia, Pa., for appellee U.S.

Before ADAMS, WEIS, and HIGGIN-BOTHAM, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The question in this appeal is whether federal agency regulations or state law give content to federal law in determining the status of a lien on collateral for a loan made by the Farmers Home Administration. The district court chose the agency regulations as appropriate, but we decide

that the controlling Supreme Court decision requires resort to state law. We also conclude that even under its own regulations, the Farmers Home Administration is not entitled to prevail. Accordingly, we will reverse the summary judgment in favor of the government and direct entry of judgment in favor of defendants.

The parties filed cross-motions for summary judgment. After consideration of the material in the record, the district court granted the government's motion but denied the defendants'. The court also declined reconsideration and defendants have appealed.

Defendants are commission brokers in Pennsylvania who sell livestock at auctions. Customarily, the farmers bring livestock to defendants the day before the scheduled sale, and in accordance with the dictates of the Packers and Stockyards Act, 7 U.S.C. § 228b (1982), the brokers pay the farmers in full within twenty-four hours of the sale.

The controversy here stems from the defendants' sale of livestock owned by Mark Noll, which was collateral for loans from the Farmers Home Administration (FmHA).[1] In August 1979, Noll borrowed $90,000 from the FmHA as an operating loan for his farm in Lancaster County, Pennsylvania, and in December 1980, he secured $230,360 as an emergency loan. As part of the transactions, Noll granted FmHA a security interest in existing and after-acquired livestock, crops, and farm equipment. FmHA filed financing statements in the local court office in accordance with state law.

Noll signed a form which provided that the collateral could "not be sold, transferred, or encumbered . . . without the written consent of the Government." Included in the form was another provision that obligated him to "comply with such farm and home management plans as may be agreed upon from time to time by Debtor and Secured Party."

Noll and the local representative of FmHA prepared a "Farm and Home Plan", form No. FmHA 431–2, which listed in detail the debtor's assets, liabilities, living expenses, and other expenditures including feed and supplies. That document also projected selling dates for cattle and crops, anticipated receipts, and outlined repayment of the FmHA loans. The plan authorized Noll to sell the cattle as they became ready for market and to pay FmHA as per a schedule.[2] Receipts in excess of the payments to FmHA were available for normal farm operating and living expenses.

Defendants did not have actual knowledge of the FmHA liens, and they, along with other brokers, sold all of Noll's cattle in 1981.[3] After deducting commissions, they paid Noll $224,791.39. He in turn deposited the funds in his bank account, and remitted $155,000 to FmHA and $21,486 to an approved secured creditor. He used the balance of $42,485.39 to purchase livestock feed and pay farm and living expenses.

Because of falling cattle prices, the actual receipts were less than those outlined in the Farm and Home Plan. In August 1981, the FmHA county supervisor met with Noll to discuss the status of the loan in view of the amount still due after the sale of all the cattle. Noll asked for another loan to pay for the expenses of harvesting his tobacco crop but that request was denied.

Soon afterward, Noll filed a petition in bankruptcy and in due course the FmHA debt was discharged. The government then filed these actions for conversion against defendants to recover the gross

---

1.  The security agreements were signed by Mark and his wife, but for simplicity's sake we will refer to the Nolls in the singular throughout the opinion.

2.  According to the supplementary payment agreement, Noll was to pay FmHA $40,000 in February; $21,000 in April; $143,500 in May; $56,000 in July; and $5,500 in December 1981.

His payments were current until the spring of 1981.

3.  Defendants Walter Dunlap & Sons, Inc. sold 68 cattle for $46,780.16; New Holland Sales Stables, Inc. sold 97 cattle for $70,117.65; Vintage Sales Stables, Inc. sold 71 cattle for $50,579.08; and Mayer Packing Co. sold 103 cattle for $59,265.

proceeds each had received from the sale of the cattle.

In addressing the cross-motions for summary judgment, the district court concluded that whether FmHA's security interest in the cattle had been released was a matter to be determined under federal law. However, since no relevant federal legislation existed, the court applied FmHA regulations governing the disposition of collateral as the rule of decision rather than state law.

The court rejected use of the Uniform Commercial Code because in its view *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), permits the invocation of state law only in the absence of a controlling federal rule. When, as here, FmHA regulations specifically addressed the release of collateral, the district court believed it had no choice but to incorporate those regulations as the rule of decision. The district judge cited this court's precedent in *United States v. Kennedy*, 738 F.2d 584 (3d Cir.1984), and *United States v. Sommerville*, 324 F.2d 712 (3d Cir.1963), as generally supporting this conclusion.

The district court found that even though FmHA had acquiesced in the sales, the government's security interest nonetheless was not released because the proceeds from the cattle had not been applied in accordance with 7 C.F.R. §§ 1962.17 and 1962.18 (1985). Finding that the cattle were "basic" rather than "normal" security, as defined by the regulations, the district court ruled that the proceeds could not be used to pay routine living and farm maintenance expenses.

Following conferences with the court on damages, the parties stipulated the amounts due, and judgments were entered against defendants.

On appeal, defendants contend that the district court erred in failing to adopt state law as the rule of decision. In the alternative, they argue that even if the FmHA

regulations were applicable the court erred in not characterizing the collateral as "normal income security." Under such a designation, Noll would have been permitted to apply the proceeds as he did. Defendants further assert that the prompt payment provisions of the Packers & Stockyards Act exempt them from liability, and that market conditions, not the cattle sales per se, were the cause of FmHA losses.

Preliminarily, we believe it important to put the holdings in *Kennedy* and *Sommerville* in context.

*Kennedy* presented a very narrow question—whether the complaint stated a claim for conversion against the buyer of collateral that secured FmHA loans. Applying the rule of conversion enunciated in *Sommerville*, we held that "under the general federal law the Government's complaint ... alleged sufficient facts to withstand [a] motion to dismiss." Those facts included the purchase of collateral by defendants, the debtors' failure to apply all of the proceeds toward repayment of the loan, and the defendants' refusal to pay the amount the debtors misapplied. The procedural posture of the case required that the allegations of the complaint be construed in favor of the government. Reading the complaint in that fashion permitted an inference that despite knowledge of the FmHA lien, the purchaser nevertheless made some payments directly to the debtor and ignored the FmHA's interest.

After resolving the issue presented, the panel went on to discuss why state law was inapplicable.[4] Referring to *Kimbell* and *Sommerville*, the panel noted that "[b]ecause we are not acting in the absence of an existing federal rule, we are not at liberty to adopt state law as the measure of the federal rule. Instead, we must apply the federal rule [of conversion] as articulated in *Sommerville*." 738 F.2d at 586 n. 3. That statement, being unnecessary to the holding in *Kennedy*, was dictum which

---

**4.** We pointedly did not determine whether the district court's interpretation of state law was correct.

has led to some uncertainty. Therefore, a detailed discussion of *Kimbell* and *Sommerville* may help clarify those misconceptions.

The debtor in *Sommerville* had an auctioneer sell livestock encumbered by an FmHA loan. But unlike the situation in this case, FmHA had not approved the sale and did not have any knowledge of the transaction at the time.

Citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), *Sommerville* stated that the need to protect the United States fisc required the application of federal law to questions arising under FmHA programs. In determining what principles to incorporate as the content of that federal law, the Court concluded that the "interest of the United States in the administration of the loan program would be undermined and its power to protect its purse limited if disparate laws of individual states were applied to substantially identical loan transactions." 324 F.2d at 716.

Although it conceded that the Uniform Commercial Code in effect in Pennsylvania would set the conditions for recordation of the security agreement and perfection of the lien, the panel expressly rejected use of any other state law. The court noted that "absent express congressional declaration of intent that state law shall be applicable, we are reluctant to subject federal rights and duties to the exceptional uncertainty and heterogeneity which may ensue in many cases. We will not do so." 324 F.2d at 717.

*Sommerville* thus adopted general federal common law as the content of the rule of decision. This court was joined in that approach by the Sixth, Ninth, and Tenth Circuits.[5] Two courts of appeals held that priority conflicts should be determined under state law.[6] One other court, the Court of Appeals for the Fifth Circuit in *United States v. Hext*, 444 F.2d 804 (5th Cir.1971),

used the Uniform Commercial Code as the source of federal law. For a review of the disagreement among the circuits, see Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 8.4[3][d] (1980); Note, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 823 (1976).

In *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), which involved the priority of federal and private liens, the Supreme Court resolved the conflict among the courts of appeals. In conformity with *Clearfield Trust*, the Court held that the issues had to be decided with reference to federal law. To that extent, the Supreme Court approved the *Sommerville* approach.

However, *Kimbell* disagreed with the premise that nationwide standards were necessary for the federal lending programs and hence disapproved *Sommerville*'s creation of federal common law principles. Rather the Court concluded that "state law may be incorporated as the federal rule of decision" because "state commercial codes 'furnish convenient solutions in no way inconsistent with adequate protection of the federal interest.'" 440 U.S. at 729, 99 S.Ct. at 1459. Furthermore, the Court declined "to override intricate state laws of general applicability on which private creditors base their daily commercial transactions." *Id.*

The Court emphasized that "had Congress intended the private commercial sector, rather than taxpayers, in general to bear the risks of default entailed by these [specialized loan] programs, it would have established a priority scheme displacing state law." 440 U.S. at 735, 99 S.Ct. at 1462. "The prudent course [therefore] is to adopt ... state law as the federal rule of decision until Congress strikes a different accommodation." *Id.* at 740, 99 S.Ct. at 1464. Hence, the Court held that in the

---

5. *Cassidy Commission Co. v. United States*, 387 F.2d 875 (10th Cir.1967); *United States v. Carson*, 372 F.2d 429 (6th Cir.1967); *United States v. Matthews*, 244 F.2d 626 (9th Cir.1957).

6. *United States v. Union Livestock Sales Co.*, 298 F.2d 755 (4th Cir.1962); *United States v. Kramel*, 234 F.2d 577 (8th Cir.1956).

absence of "a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws." *Id.*

*Kimbell* is not a conversion case, but its discussion and holding undermine the validity of *Sommerville*'s rejection of the Uniform Commercial Code as a source of the federal rule of decision. *Accord United States v. Progressive Farmers Marketing Agency,* 788 F.2d 1327 (8th Cir.1986); *United States v. Tugwell,* 779 F.2d 5 (4th Cir.1985); *United States v. Public Auction Yard, Billings, Mont.,* 637 F.2d 613 (9th Cir.1980); *United States v. Southeast Miss. Livestock Farmers Ass'n,* 619 F.2d 435 (5th Cir.1980); *United States v. Friend's Stockyard, Inc.,* 600 F.2d 9 (4th Cir.1979). Clark, *The Law of Secured Transactions* ¶ 8.4[3][d] (1980). *Cf. United States v. Missouri Farmers Ass'n, Inc.,* 764 F.2d 488 (8th Cir.1985); *United States v. Farmers Co-Op Co.,* 708 F.2d 352 (8th Cir.1983).

Relying on *Kimbell,* defendants here cite § 9–306 of the Uniform Commercial Code, which states that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise." 13 Pa.Cons.Stat.Ann. § 9306(b) (1984).

The evidence is undisputed that the FmHA plan contemplated sales of the secured cattle and use of proceeds to defray farm expenses as well as to meet the loan repayment schedule. Any possible ambiguity on this score was clarified by the deposition of the FmHA county supervisor, Patrick Freeman. When questioned whether he had any discussion with Noll about sales, Freeman testified that "I was very

emphatic that he was to sell [the cattle] and properly account for the proceeds." When asked if Noll had to obtain consent before selling any livestock, Freeman replied, "No ... when the cattle [were] ready to go to market and the market [was] available, he was expected to sell them."

■ Even before the Uniform Commercial Code was adopted in Pennsylvania, case law had established the general proposition that acquiescence in sale of collateral by a mortgagee constitutes waiver of a lien. *East Central Fruit Growers Prod. Credit Ass'n. v. Zuritsky,* 346 Pa. 335, 30 A.2d 133 (1943). This continues to be the law in Pennsylvania under the Uniform Commercial Code. Similar interpretations of the Code have been made by other courts. *See United States v. Southeast Miss. Livestock Farmers Ass'n.,* 619 F.2d 435 (5th Cir.1980). Hence, when state law is incorporated as the content of the federal rule of decision, these defendants must prevail.[7]

The government, however, insists that the FmHA regulations should be adopted as the source of federal law. This argument is divided into several parts.

The FmHA asserts that 7 C.F.R. § 1962.-18(b) (1985) requires the proceeds of the sale to be applied in a specified manner before a lien can be lifted. In the government's view and as the district court found, Noll did not apply the proceeds in the manner prescribed by the regulations.

Section 1962.18(b) states that when the debtor sells security, the sale will be subject to the FmHA lien,

"until the lien is released or the sale is approved by the County Supervisor and the proceeds are used for one or more of the purposes stated in § 1962.17. Pur-

---

**7.** As noted earlier, *Sommerville* does not control here because there the FmHA did not consent to the sales, and the court's refusal to use state law was disapproved in *Kimbell.* Although this court's Internal Operating Procedure Chapter 8C provides that a panel may not overrule an earlier panel decision, we have recognized that this principle is inapplicable when the earlier opinion is in conflict with intervening Supreme

Court precedent. *See Rubin v. Buckman,* 727 F.2d 71, 74 (3d Cir.1984). *Sommerville,* as well as *Kennedy*'s dicta, which affirmed its rationale, cannot co-exist with *Kimbell* and accordingly are not binding on us here. Consequently, because *Sommerville* is contrary to *Kimbell* this court's IOPs do not require in banc consideration to align our jurisprudence with the Supreme Court's teaching.

chasers of security who inquire should be informed that the property is subject to FmHA's lien and will remain subject to it until they deliver any proceeds in cash to the County Supervisor or make checks payable jointly to the borrower and FmHA and the check has cleared."

Relying on this provision, FmHA insists that until the sales are approved by the county supervisor and the proceeds used for specified purposes, the lien remains in effect.

▮▮▮ In some circumstances, agency regulations have the force of law and to that extent may supply the rule of decision in federal question cases. Because of constitutional constraints, that source of law, however, is subject to definite limitations. For example, "interpretative" rules do not have the force and effect of law because they are statements of policy issued by an agency asserting its construction of a statute or regulation. In contrast, "substantive" regulations may have the force of law if they are authorized by Congress and promulgated by an agency to implement a statute. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 1717–18 n. 31, 60 L.Ed.2d 208 (1979).

▮▮▮ The regulation at issue here is interpretive rather than substantive. It is directed principally to debtors and to those purchasers who inquire of FmHA and inferentially have actual notice of a lien. The regulation instructs FmHA employees how to answer those inquiries, but does not by its terms impose a legal duty on purchasers to issue checks to joint payees. The text of the regulation demonstrates that it is merely in the nature of a policy explanation and direction to agency employees rather than a legal mandate. A regulation which is to be treated as having the force of law, at a minimum, should have the definitiveness associated with statutory language when, as here, the conduct of third parties having no relationship with the agency is affected.

In this context, the testimony of Mr. Freeman, the county supervisor, is significant. He said Noll not only was authorized to receive the money in his own name but also was permitted to put it in his personal bank account and remit whatever amount was due FmHA on a periodic basis. This testimony shows that FmHA's practices were inconsistent with an intent to impose more requirements on purchasers than are contained in the Uniform Commercial Code.

Even if the regulation were considered as substantive, it nevertheless would not be entitled to be treated as applicable "law." Substantive regulations affect individual rights and obligations but do not without more have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. at 302, 99 S.Ct. at 1718. For that to occur, "it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Id.* at 304, 99 S.Ct. at 1719.

It may be seen that by prescribing restricted application of the proceeds before the lien is released, even though the sale was approved, FmHA attempts to impose a burden on the purchaser beyond that required under state law. No federal statutory source is cited for this additional dictate, and the regulation appears to be an agency creation aimed solely at increasing the government's collection efficiency.

*Kimbell*'s holding and rationale rest on the underlying premise that Congress "did not intend to confer special privileges on agencies that enter the commercial field." 440 U.S. at 737, 99 S.Ct. at 1463. The Court noted that the stability of state commercial law should not be altered "in the absence of careful legislative deliberation." *Id.* at 740, 99 S.Ct. at 1464. Since the government failed to advance "any concrete reasons for rejecting well-established commercial rules which have proven workable over time," the Court resorted to state law. *Id.*

*Kimbell* reached that conclusion only after comprehensive citations to various regulations which had a bearing on the issues presented. *See* 440 U.S. at 731–33, 737, 99 S.Ct. at 1460–61, 1463. The Court demonstrably was aware that agency regulations

"were in the picture" but nevertheless chose state commercial law to give content to the federal rule of decision. That choice was fully informed, and the Court noted agreement with a comment in an opinion by Judge Friendly where he stated, "When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States." *Id.* at 732 n. 28, 99 S.Ct. at 1460 n. 28, quoting *United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir.1966). It is obvious that giving the effect of law to a variety of regulations by a number of agencies would be particularly disruptive to the stability of commercial law.

*Kimbell*'s holding is in effect a finding that in the area of federal lending programs regulations such as 7 C.F.R. § 1962.18(b) (1985), enacted under a general enabling provision, do not constitute the sort of explicit "congressional directive" that will displace the application of state law as the federal rule of decision. The FmHA regulation is not a "congressional directive," nor is there any evidence that it represents congressional policy. We therefore must heed *Kimbell*'s direction to "adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." 440 U.S. at 740, 99 S.Ct. at 1464.

The wisdom of pursuing that approach is demonstrated by the enactment of The Food Security Act of 1985, 7 U.S.C.A. § 1631 (1985), effective December 26, 1986 —the type of congressional directive referred to in *Kimbell*. That statute provides that a commission merchant shall not be subject to a security interest in products of others which he sells, unless he receives detailed written notice of the lien within one year before the sale. 7 U.S.C.A. § 1631(g).

Because the regulations on which FmHA relies do not have the force of a congressional directive and because there is no indication that Congress intended an agency regulation to supersede long-standing uniform state law in this area, we decline to accept the government's position that the regulations control. *See United States v. Central Livestock Corp.*, 616 F.Supp. 629 (D.Kan.1985).

Nevertheless, assuming arguendo that FmHA regulations govern, we conclude they do not entitle the government to prevail. At the time the repayments were made, 7 C.F.R. § 1962.17 provided for a number of permissible applications for proceeds depending on the characterization the agency applied to the security. This classification procedure had no specific statutory source and was an agency creation.

■ That regulation described the collateral as either "basic" or "normal income security." The importance of that designation lies in the fact that payment of routine living and farm operating expenses is permissible when normal income security is involved, but not when the collateral is basic security. The government conceded in the pretrial statement that the amounts Noll received in excess of that paid to a bank and FmHA "were used as operating credit by the Nolls to pay normal routine farm expenses." Consequently, if the security here were treated as normal income security, the government would not be entitled to recover even under its own regulations because Noll correctly applied the proceeds.

The district court, however, believed the cattle were basic security, which is defined as "all equipment (including fixtures in UCC states) and foundation herds ... securing FmHA loans which serve as a basis for the farming or the operation outlined in ... the Farm and Home Plan ... and replacement of such property." Normal income security is "all security not considered basic security including crops, livestock ... and other property ... which are sold in operating the farm." 7 C.F.R. § 1962.17.

According to the regulations, "foundation herds" are basic security, but the cattle here cannot be characterized as such.

The word "foundation" carries with it the notion of a base on which a structure is built. As used in the regulation, it would mean a herd used to supply milk products or to breed stock, not one intended for immediate sale.

Obviously livestock held for sale fall into quite a different category than equipment such as trucks and tractors that remain on the farm for a number of years. That type of collateral is basic security because it generally serves as a foundation for capital development as distinguished from articles held for sale.

Additional support for this interpretation of the regulatory classification is found in the designation of "crops" as normal income security. The absence of that type of collateral from the definition of basic security is a significant indication that normal security includes goods produced primarily for sale.[8]

The uncontradicted evidence in this case reveals that the cattle were to be sold as soon as they were ready for the market. The county supervisor testified to that, and the "Farm and Home Plan" prepared by the county supervisor on December 24, 1980, designates the steers as "livestock held for sale." Clearly the record establishes that the cattle sold by Noll were "normal", not "basic" security.

Consequently, we conclude that the district court erred in classifying the livestock as basic security. It follows that in light of the government's concession in the pretrial statement that the proceeds of the sale were properly applied, even the regulatory requirement of consent was satisfied. Thus the foundation of the government's case collapses.

Because there are no undisputed questions of material fact, this case is appropriate for summary judgment, and therefore will be remanded to the district court with instructions to enter judgment for defendants.

ADAMS, J., Circuit Judge, concurring.

I concur in the result reached by the majority, but because I arrive at the same conclusion by an approach quite different jurisprudentially from that employed by the majority, I write separately.

### I.

It is common ground that under *Clearfield Trust Co. v. United States,* 318 U.S. 363, 363, 63 S.Ct. 573, 573–74, 87 L.Ed. 838 (1943), federal law governs in this case. *See also, United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The troublesome issue concerns the *content* of the federal law.

*Clearfield Trust* declared that "[i]n the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." 318 U.S. at 367, 63 S.Ct. at 575. In providing the substance of the federal law in the absence of federal legislation, courts are generally faced with a choice between fashioning federal common law or adopting the applicable state law. *Kimbell Foods* clarified *Clearfield Trust* by elaborating the factors to be considered when weighing, in the absence of legislative direction, the choice between judicially fashioned federal common law or judicial adoption of state law, in giving the federal law content.

In the case at hand, in contrast, there is valid non-judicial federal law, in the form of an agency regulation promulgated pursuant to an act of Congress, that is applicable to the legal question presented. Consequently, the rule of thumb provided by *Kimbell Foods* for guiding judicial crafting of the contours of federal law is inapposite. This, I respectfully suggest, is where the majority's analysis of this issue may have gone astray.

---

**8.** The current regulations of FmHA no longer contain the classification "basic security" and "normal income security." The regulations now provide that proceeds from sales may be used for essential farm and family living expenses in accordance with the Farm and Home Plan. 7 C.F.R. §§ 1962.17(a) and (b)(2)(iv) (1986).

As one commentator has observed concerning federal court adoption of state law,

> [t]he adoption doctrine involves several considerations similar to the preemption doctrine ..., but the adoption issue arises not when there are both federal and state laws on the issue in question, but when a state law of general applicability is considered as *a means of determining an issue on which Congress is silent.* While the presence of congressional intent to occupy the area of law is one ground for preemption, *the absence of any congressional intent is one of the prerequisites for the existence of the adoption issue.*

Note, *Adopting State Law as the Federal Rule of Decision: A Proposed Test,* 43 U.Chi.L.Rev. 823, 827 n. 28 (1976) (emphasis added). Accordingly, it is clear that the first question in giving effect to federal law is whether the Congress has provided, directly or indirectly, any relevant legislation. This is so because the judicial branch may fill the void, with specialized federal common law or adopted state law, only if there is a void to be filled.

> Because the federal government, its judicial branch included, is one of limited powers, the ultimate sources of federal law are usually thought of as reposing not in the pronouncements of the courts but in the constitutional and statutory texts that define the reach of federal governance. The federal judicial function is habitually regarded as explication of the texts.

Hill, *The Law-Making Power of the Federal Courts: Constitutional Preemption,* 67 Colum.L.Rev. 1024, 1024 (1967). "Thus, when a federal court announces a federal rule of decision in an area of plenary congressional competence, it exercises an initiative normally left to Congress, ousts state law, and yet acts without the political checks on national power created by state representation in Congress." Monaghan, *The Supreme Court, 1974 Term—Foreward: Constitutional Common Law,* 89 Harv.L.Rev. 1, 11 (1974). "Federal intervention has been thought of as requiring special justification, and the decision that such justification has been shown, being essentially discretionary, has belonged in most cases to Congress." Hart, *The Relations Between State and Federal Law,* 54 Colum.L.Rev. 489, 497 (1954).

It is, moreover, firmly established that when Congress has spoken, the courts may not ignore the legislative directive, save for unconstitutional enactments, and instead fashion their own judge-made law. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The judicial role outlined in *Clearfield Trust* and *Kimbell Foods,* then, is circumscribed by the doctrines of federalism and separation of powers. The *Kimbell Foods* test comes into play only when the judiciary is called upon to supply the substance of federal law because none has been furnished by other appropriate federal law-making authorities.

This constitutional principle has been all too often ignored, however, in the improvident resort to *Kimbell Foods.* The two cases that comprised *Kimbell Foods* arose in situations in which no agency regulation existed or was asserted to exist;[1] instead, in both cases, the lower courts framed their own federal rules to cover the situations. 440 U.S. at 718–27, 99 S.Ct. at 1453–58. The issue before the Supreme Court was the choice between such judicially-crafted rules of national application and adoption of the law of the forum state. The agen-

---

**1.** The majority notes that the *Kimbell Foods* Court reached its conclusion "only after comprehensive citations to various regulations which had a bearing on the issues presented. *See* 440 U.S. at 731–33, 737 [99 S.Ct. at 1460–61, 1463]." *Ante,* at 1238. These regulations had bearing on the issues, however, only to show that the agencies themselves recognized the importance of, and relied upon, state laws in their other areas of operations, thus weakening the argument that a national rule needed to be fashioned *by the courts.* Agency regulations "'were in the picture'" in the sense that the agencies did indeed have regulations. None of them, however, governed the point in question before the Court, which was precisely why the *Kimbell Foods* Court was faced with a choice between federal (common) law and incorporation of state law.

cies concerned in the *Kimbell Foods* cases (the Small Business Administration and the Farmers Home Administration (FmHA)) argued for implementation of the favorable national rule devised and applied by the courts. When the Supreme Court rejected the rule formulated by the district courts, it did not reject an agency regulation of national application in favor of adopting state laws. Nor did *Kimbell Foods* hold that, as to all issues surrounding federal non-tax liens, state law rather than a national rule must be applied, thereby invalidating federal statutes or regulations. Rather, the Court held merely that in the absence of such non-judicial federal law, state law rather than a judicially created national rule should govern the issue of lien priority.

Congress is not the only appropriate source of federal law to which the courts must look before developing federal law judicially. Valid agency regulations must also be regarded as non-judicial sources of binding federal law.

> The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function of laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.

*Panama Ref. Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Thus, "[i]t has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979) (citing *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405–06 n. 9, 53 L.Ed.2d 448 (1977)). *See also Foti v. INS*, 375 U.S. 217, 223, 84 S.Ct. 306, 310–11, 11 L.Ed.2d 281 (1963);

*United States v. Mersky*, 361 U.S. 431, 437–38, 80 S.Ct. 459, 463–64, 4 L.Ed.2d 423 (1960); *Atchison, T. & S.F. Ry. Co. v. Scarlett*, 300 U.S. 471, 474, 57 S.Ct. 541, 543, 81 L.Ed. 748 (1937). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Chrysler*, 441 U.S. at 295–96, 99 S.Ct. at 1714–15. Since valid agency regulations as well as congressional legislation will be given effect by the courts, the *Kimbell Foods* issue arises, and courts must devise the content of federal law themselves, only if *neither* non-judicial source of federal law is present. *Clearfield* merely "directs federal courts to fill the interstices of federal legislation." *Kimbell Foods*, 440 U.S. at 727, 99 S.Ct. at 1458.

## II.

The question here, then, is whether the federal regulations in question, 7 C.F.R. §§ 1962.17 & 1962.18, represent "properly promulgated, substantive agency regulations" that "have the 'force and effect of law.'" *Chrysler*, 441 U.S. at 295, 99 S.Ct. at 1714. Under *Chrysler*, an agency regulation has the force and effect of law if: (1) the power to legislate on the subject and to promulgate the rule in question has been granted the agency by Congress and the regulation was promulgated in conformity with the congressionally mandated limitations; and (2) the regulation is a substantive (or "legislative"), rather than an interpretative, rule. *Chrysler*, 441 U.S. at 301–03, 99 S.Ct. at 1717–18.

## A.

Authority to promulgate the regulations in question here derives from 5 U.S.C. § 301, and 7 U.S.C. §§ 1631(g), 1921 *et seq.*, and 1989 (1985). This authority is delegated to the undersecretary of agriculture by 7 C.F.R. § 2.23, and thence to FmHA under 7 C.F.R. § 2.70. For nearly half a century, such delegations of legislative authority have been the norm.

The majority in its opinion seeks to lay down several new—and somewhat questionable—doctrines of administrative law: First, the majority seems to assert that Congress must explicitly delegate every rule an agency drafts—that Congress had to enact a statute empowering FmHA, in so many words, to formulate a rule specifying that sale profits must be appropriately applied in order for a lien to dissolve. Such a view has not been the law since *Panama Refining, supra*. Unless the majority is prepared to suggest that federal regulations governing federal liens securing federal loans are beyond the power delegated by the legislation, establishing the loan program and authorizing the agency to administer it and promulgate regulations governing it, the required "nexus between the regulations and some delegation of the requisite authority by Congress," *ante*, at 1238 (quoting *Chrysler Corp.*, 441 U.S. at 302, 99 S.Ct. at 1717–18), would seem to be clear.

Further, the majority presents a somewhat narrower objection: that the declaration in *Kimbell Foods* that "the stability of state commercial law should not be altered 'in the absence of careful legislative deliberation,'" *ante*, at 1238 (quoting *Kimbell Foods*, 440 U.S. at 737, 99 S.Ct. at 1463), renders ineffectual the agency's attempt to regulate in this area under Congress's broad delegation of authority. Because the Supreme Court in *Kimbell Foods* stated that farm loan liens constitute an area in which congressional intent should be manifest before *courts* overturn state law, the majority argues that this consequently is an area in which *agencies* should not promulgate regulations altering state law without manifest congressional intent.

It would be a novel approach to administrative law to suggest that the courts may declare certain subject areas of federal legislation to be for Congress alone absent a specific congressional mandate, thereby not only constraining improper judicial legislating but also vitiating, as to such subjects, proper "general enabling provisions," *see ante*, at 1239. The majority cites no authority for such a proposition, nor could it.

In fact, *no* decision of the past 49 years could stand for "a finding that in the area of federal lending programs regulations ... enacted under a general enabling provision ... do not constitute the sort of explicit 'congressional directive' that will displace the application of state law as the federal rule of decision." *Ante*, at 1239. As discussed *supra* at 1240–1242 *Kimbell Foods* in no way stands for such a finding as regards *agency* regulations, but stands rather for the proposition that *courts* should not upset state law in such areas absent a directive from the federal lawmaking branches.

The majority's jurisprudence on this point also implies that courts should ignore federal regulations in some, if not all, cases when there is conflicting state law extant. *See ante*, at 1238. This clearly would be contrary to the supremacy clause.

### B.

Dunlap's primary argument, however, is that, under the first prong of the *Chrysler* test, the regulation in question is "interpretative" rather than legislative in nature. An interpretative rule, which does not have the force and effect of law, gives guidance to the staff of an agency and to affected parties regarding "how the agency intends to administer a statute or regulation. In contrast, a legislative rule, rather than merely setting forth an agency's own interpretation of a statute it administers, actually implements that statute and, in so doing, 'creates' new law 'affecting individual rights and obligations.'" *New Jersey v. HHS*, 670 F.2d 1262, 1281–82 (3d Cir.1981). *See Chrysler*, 441 U.S. at 302, 99 S.Ct. at 1717–18 (describing a "substantive rule" as "one 'affecting individual rights and obligations'" and observing that "[t]his characteristic is an important touchstone for distinguishing those rules that may be 'binding' or have the 'force of law'").

Appellants here contend, and the majority agrees, that the regulation is directed principally to FmHA employees; that it merely instructs employees how to answer

inquiries from purchasers who inquire of the agency and provides guidelines for when to consider a lien as still in force for agency purposes; and that it does not by its terms impose any legal duty on purchasers. *Ante* at 1238. *See also United States v. Central Livestock Corp.*, 616 F.Supp. 629 (D.Kan.1985).

In light of this contention, the question becomes whether the FmHA promulgated these rules merely as internal guidelines, or as substantive law "affecting individual rights and obligations." The Court of Appeals for the District of Columbia Circuit recently held that "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) ..., and which the government regulations provide shall contain only 'each Federal *regulation* of general applicability and current or future effect,' 1 C.F.R. § 81 (1986)...." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C.Cir.1986) (emphasis in original).

The rule at issue here was propounded in conformity with the Administrative Procedure Act, and notice of the proposed rulemaking was published in the Federal Register at 44 Fed.Reg. 4436 *et seq.* (Jan. 22, 1979). Dunlap contends that the rulemaking was procedurally deficient because the notice "gave no inkling that [FmHA] was promulgating anything more than technical instructions to its officers on when and how to release liens." *Brief for Appellant* at 5 n. 2. The Notice of Rulemaking published in the Federal Register, however, announced, "This regulation is being published as a rule, with a request for comments, since the purpose of the change is to restructure existing regulations and incorporate provisions of the Agricultural Credit Act of 1978." 44 Fed.Reg. 4437.

Turning to the regulations themselves, while a single clause of the regulations is phrased in hortatory terms to agency employees ("for example, if a borrower requests a release of 5 cows, make sure that not all the cattle are released," § 1962.-17(d)), the mandatory nature of the regulations is clear. *See, e.g.*, § 1962.18(b) ("The borrower *must* account for all security.... When borrowers sell security, *the sale will be made subject to the FmHA lien.* The property and proceeds *will remain subject to the lien* until the lien is released or the sale is approved by the County Supervisor and the proceeds are used for one or more of the [permissible] purposes.") (emphasis added). The regulations make plain that the FmHA lien *will not be released* unless (a) the sale of the encumbered asset is approved by the FmHA county commissioner, *and* (b) the proceeds of the sale are applied only toward a permissible end. Failing this, it is FmHA's intent under the regulation that the lien not be dissolved.

The majority asserts:

No federal statutory source is cited for this additional dictate, and the regulation appears to be an agency creation aimed solely at increasing the government's collection efficiency. As worthy as that motive might be, it does not have *Kimbell*'s support.

*Ante* at 1238. With all respect, I cannot agree. The purpose of the FmHA loans and the attendant Farm Management Plans is not merely the sale of the cattle but the repayment to the government of the loan from the proceeds of such sale. Although other, limited expenditure needs may be met out of the proceeds of the sale, in general the loan recipient must make repayment of the loan a primary use of the proceeds of sale. The FmHA, like any lender, protects itself in this arrangement by encumbering the collateral so that if it is sold and the sale proceeds are not used to repay the loan, the agency may recoup its outlay by taking possession of the collateral or by bringing a conversion action for its value. The agency thus requires that its lien against the collateral continue in effect beyond the agency-approved sale of the collateral until it can be assured that the proceeds are being used appropriately, whereas under the UCC (and, thus, most

state laws), the agency's consent to the sale would dissolve the lien. For this reason, the FmHA needs explicitly to override state law to achieve its purpose, and this it constitutionally and statutorily may do.

In addition, the regulations provide a way around any hardship caused by imposing upon third parties who transact business with encumbered farmers the *de facto* obligation to oversee the farmers' use of the sale proceeds subsequent to the conclusion of their transaction: They stipulate that the agency will release the lien if the proceeds of the sale are handed over by the third party not to the farmer but rather *jointly* to the farmer and the FmHA.[2] But the fact that FmHA gives third parties such as Dunlap the *option* of avoiding, through issuance of a joint-payee check, continued exposure to conversion until farmers dispose of sale proceeds properly, rather than *mandating* issuance of such checks, does not reduce the regulations to a mere statement of policy or render their provisions inapposite.

The FmHA regulations appear, then, to be intended as substantive provisions that establish a new (non-UCC) requirement for the dissolution of FmHA liens. Clearly, the FmHA did in fact intend that state commercial law should not apply when the result would be the detrimental release of FmHA's lien. This is neither an unconstitutional nor illogical policy. The regulation in question constitutes valid and enforceable federal law. It is thus the law governing this case. To ignore the FmHA regulations would require declaring them invalid as *ultra vires*, a step that has nothing whatsoever to do with *Kimbell Foods*, and one that should be recognized, and made explicit, if that is what the majority intends

to do here. Under settled principles of administrative law, I do not believe there is any basis for such a declaration, and failing that, there is no compelling reason not to give the regulations the force of law.

In sum, in *Kimbell Foods* the Supreme Court addressed the propriety of *judge-made law* in the absence of a congressional mandate, not regulations promulgated by a federal agency under a congressional grant of authority. Thus, that case does not control here, and the applicable FmHA regulations should apply. *Accord United States v. Farmers Co-op. Co.*, 708 F.2d 352, 353 n. 2 (8th Cir.1983) ("[W]e agree with the government that 7 C.F.R. § 1962.-17 governs the release or its security interest.").

### III.

There remains, however, the question of the proper application of the regulations. The majority notes, as an alternative ground for its holding, and I agree, that the appropriate interpretation of FmHA's own regulations would be that the cattle at issue represented "normal," rather than "basic," security. *Ante* at 1239–1240. That being so, two conditions need be met under § 1962.18 for the release of the agency's security interest: (1) that the FmHA consents to the sale, and (2) that the proceeds be applied toward an end permissible under § 1962.17.

The trial court found that FmHA consented to Noll's sale of the cattle. *See ante* at 1234, 1234, 1237. And the agency admits that, were the cattle to be classified as normal rather than basic security, the conditions imposed by § 1962.17 would be met. *See ante* at 1240. Since I agree with the majority's characterization of the secu-

---

**2.** These requirements, of course, still impose upon third parties an obligation to inform themselves of any lien outstanding against the products they handle. This obviously places a burden on auctioneers who, under the Packers and Stockyards Administration rules, must turn the proceeds of the sale over to the farmer by the close of business of the following day. The Food Security Act of 1985, 7 U.S.C. § 1631 (effective Dec. 26, 1986), will alleviate this problem. As the majority notes, the 1985 Act "pro-

vides that a commission merchant shall not be subject to a security interest in products of others which he sells, unless he receives detailed written notice of the lien within one year before the sale." *Ante* at 1239. This problem, then, will in the future cease to plague auctioneers such as appellants, who would otherwise admittedly be placed in something of a dilemma by the combination of the FmHA regulations, on the one hand, and the Packers & Stockyards Authority regulations, on the other.

rity interest in Noll's cattle as normal security, I would hold that under the applicable FmHA regulations the agency's security interest was released upon Noll's sale of the cattle. The appellants in this case therefore are not liable for conversion of the cattle.

## IV.

In *United States v. Kennedy*, 738 F.2d 584 (3d Cir.1984), this court agreed that the *Kimbell Foods* test is inapplicable if there is a federal source of federal law, but interpreted this to include prior *judicial* rulings. This would mean, however, that once a federal court laid down a federal common law rule, subsequent courts would be bound to follow it as furnishing the appropriate federal content—even though *Kimbell Foods* explicitly declared that such national judge-made law is *not* to be fashioned or followed where state law would suffice. *Kennedy* erred, it seems, in asserting that prior court decisions can provide the federal element that obviates resort to the *Kimbell Foods* analysis. (Such decisions can, of course, supply the federal common law should the *Kimbell Foods* analysis favor application of a national rule.)

*Kennedy*, however, cannot be dismissed as quickly as the majority seeks to do. Despite the fact that *Kennedy* came before us on a motion for summary judgment, the issue presented to the Court—whether the government had stated a claim for relief—required the Court to reach the question whether state or federal law applied, and, if federal law applied, its content. This Court ruled that *Clearfield Trust* mandated that federal law control, and then stated that "because the general federal law of conversion has already been defined" by a prior ruling of this Court, "we are not acting in the absence of an existing federal rule," and therefore "we are not at liberty to adopt state law as the measure of the federal rule." 738 F.2d at 586 n. 3. This explication in the *Kennedy* opinion precedes, both logically and in fact, the ruling on the sufficiency of the government's factual allegations. *See id.* at 587. It thus would be inaccurate to rule that "the [*Kennedy*] panel went on to discuss why state law was inapplicable" only "[a]fter resolving the issue presented" concerning the sufficiency of the government's allegations, and that, therefore, this portion of the *Kennedy* holding is mere dictum. *Ante,* at 1235. Moreover, while I agree that *Sommerville* does not constitute binding precedent because of the intervening Supreme Court opinion in *Kimbell Foods, see ante,* at 1237 n. 7, this exception to our Court's Internal Operating Procedures (IOP's) does not apply to *Kennedy: Kennedy* was decided by this Court subsequent to the *Kimbell Foods* decision, purportedly in conformance with its dictates. Although *Kennedy* adopted as the rule of law the *Sommerville* decision to which we need not adhere, that does not mean that *Kennedy* itself is a ruling that we may similarly ignore under our IOP's.

Although I joined the court's opinion in *Kennedy*, I can no longer concur in its reasoning. Where valid federal regulations exist, as in *Kennedy* and here, there is no need to resort to federal common law, whether crafted for the specific case or for prior cases. Accordingly, I believe that it would be in order for the Court to ·grant rehearing in banc to clarify the controlling law for the bench and bar of this circuit.

## V.

In sum, I concur in the Court's judgment because I agree with its alternative holding that the cattle in question represented normal security under the regulations, and the lien therefore was released by the FmHA-approved sale. I do not join, however, the Court's analysis regarding the validity of the regulations and their applicability in the face of contrary state law. In addition, I believe that the Court might wish to consider this issue *in banc* in order to clear up any confusion regarding federal farm lien law, by clarifying the important process by which a court must give content to federal law.