**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**CURRITUCK GRAIN, INCORPORATED,**
**Defendant–Appellee.**

**No. 91–1806.**

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1992.

Decided Sept. 30, 1993.

Rudolf A. Renfer, Jr., U.S. Atty., Raleigh, Walter Lee Hinson, Jr., Narron, Holdford, Babb, Harrison & Rhodes, P.A., Wilson, NC, argued (B. Perry Morrison, Jr., Narron, Holdford, Babb, Harrison & Rhodes, P.A., Wilson, NC, on the brief), for plaintiff-appellant.

John David Leidy, Hornthal, Riley, Ellis & Maland, Elizabeth City, NC, argued (Mark M. Maland, Hornthal, Riley, Ellis & Maland, Elizabeth City, NC, on the brief), for defendant-appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

## OPINION

WIDENER, Circuit Judge:

The United States, on behalf of the Farmer's Home Administration (FmHA), appeals from an order of the United States District Court for the Eastern District of North Carolina dismissing its action in conversion against appellee Currituck Grain, Inc. (Currituck). In its complaint the FmHA alleged that Currituck converted property of the United States when it purchased certain crops subject to a security interest in favor of the FmHA. Finding that North Carolina commercial law provided the rule of decision under principles of federal common law, the district court dismissed the action on the grounds that under North Carolina's enactment of the Uniform Commercial Code

(UCC), the FmHA's security interest in the crops had become subordinated to Currituck's interest at the time of the disputed sale, thereby depriving the FmHA of a cause of action for conversion against Currituck. We affirm.

## I

As the district court dismissed the case pursuant to Fed.R.Civ.P. 12(b)(6), we assume as true all factual allegations in the complaint. The facts relevant to this appeal are uncomplicated. Though the record does not disclose the exact date, sometime in early 1985 the FmHA extended a farm operating loan to Mr. and Mrs. Robert S. Meiggs. Pursuant to the loan agreement the Meiggs granted the FmHA a security interest in all of their crops to be produced during the 1985 crop season. The FmHA properly perfected the security interest by filing a financing statement in the office of the Currituck County Register of Deeds.

Between September 1, 1985, and November 27, 1985, Currituck purchased corn and soybeans from the Meiggs for a total purchase price of $54,148.55. Though those products were subject to the FmHA's security interest, none of the purchase price was ever paid to the FmHA, nor did that agency consent to the sale or intentionally release its security interest. Sometime after these sales the Meiggs apparently defaulted on their loan obligation to the FmHA.[1] After learning of the Meiggs' default and of their unauthorized sale of the collateral, the FmHA sought payment from Currituck in the amount of the value of the corn and soybeans received from the Meiggs. Then, on February 20, 1991, some 62 months after the last sale, the FmHA filed a complaint against Currituck alleging conversion of the encumbered grain.

In turn, Currituck moved to dismiss the complaint on the grounds that, through the operation of N.C.GEN.STAT. §§ 25–9–301(1), 25–9–403(2), and 44–69.1, the FmHA's security interest had become unperfected and subordinate to Currituck's interest as a purchaser of the grain retroactively from

June 20, 1987, 18 months after the Meiggs' final sale to Currituck. Thus, Currituck argued that at the time of sale and at the time of suit the FmHA had no present possessory interest in the grain on which to base a suit for conversion, and that applicable state law thus provided FmHA with no remedy. The FmHA opposed the motion, arguing that its cause of action in conversion against Currituck accrued at the time of the unauthorized grain sales and that, under principles of federal common law, the six-year federal statute of limitations for conversion of government property applied and made timely the action. See 28 U.S.C. § 2415(b). The district court agreed with Currituck and, by order dated July 15, 1991, dismissed the complaint. The FmHA now appeals.

## II

■ This case involves questions respecting the rights and responsibilities of the United States in carrying out a nationwide federal loan program. Because of the strong federal interest implicated when the United States disburses funds from the public fisc, it is well established that federal law ultimately controls the government's rights and responsibilities when acting in this arena. See *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943). The rule of decision governing a particular issue or set of issues, however, need not be a uniform federal one. Rather, the federal courts may adopt the otherwise-applicable state law as the rule of decision under federal common law in an appropriate case. See *Kimbell Foods*, 440 U.S. at 727–29, 99 S.Ct. at 1457–59. In the instant case the district court held that the Court's decision in *Kimbell Foods* required the adoption of North Carolina lien law as the rule of decision in disputes arising out of the FmHA's participation as a lender in the private credit market, and that North Carolina law provided the FmHA with no cause of action against Currituck. Before address-

---

1. Counsel for the FmHA informed us at oral argument that the Meiggs filed a case in bankruptcy and have since received a discharge of their debt to the government.

ing whether state commercial law should supply the rule of decision here, we first examine the district court's application of that law to the dispute between Currituck and the FmHA.

Under North Carolina's enactment of the UCC, as a general rule when a debtor sells property subject to a creditor's security interest without the creditor's consent, that security interest continues in the property in the hands of the third-party purchaser. See N.C.GEN.STAT. § 25–9–306(2).[2] Thus, after such an unauthorized sale of collateral, in addition to recovering against proceeds in the hands of the debtor, "the secured party may repossess the collateral from [the transferee] or in an appropriate case maintain an action for conversion [against the transferee]." N.C.GEN.STAT. § 25–9–306 amended official comment 3.

But the UCC provides an important exception to the principle that security interests continue in collateral after an unauthorized sale. N.C.GEN.STAT. § 25–9–307(1) provides that "[a] buyer in the ordinary course of business ... other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." An examination of the ever-important definition sections of the UCC reveals that in this case Currituck qualifies as "a person buying farm products from a person engaged in farming operations," see N.C.GEN.STAT. § 25–9–109(3), and thus does not enjoy the benefit of this exception. Accordingly, by virtue of the farm products exception to Section 25–9–307(1) the FmHA's perfected security interest remained in the collateral after its sale to Currituck.

However, other provisions of North Carolina commercial law work to mitigate the effect of the farm products exception. Section 25–9–403(2) establishes a general limit on the period of time over which a security interest may be perfected and thus maintain priority over later-in-time security interests, judgment liens, and purchasers. That section states in relevant part:

> Except as provided in ... article 12 of chapter 44, a filed financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of the five-year period unless a continuation statement is filed prior to the lapse.... Upon lapse the security interest becomes unperfected, unless it is perfected without filing. If the security interest becomes unperfected upon lapse, it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse.

Thus, Section 25–9–403(2) provides that when a financing statement lapses due to the passage of time, the underlying security interest becomes unperfected both prospectively, as against later-in-time lien creditors and purchasers, and as it relates back against persons who became purchasers or lien creditors before lapse. See B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 2.14, at 2–144 to 2–145 (1988).

Also relevant to the instant case is Section 25–9–403's reference to article 12 of chapter 44 of the General Statutes of North Carolina, which addresses various types of liens. Section 44–69.1 provides as follows:

> No chattel mortgage, agricultural lien, or any lien of any nature upon peanuts, cotton, soybeans, corn, wheat or other grains shall be effective for any purpose for a longer period than 18 months from the date of sale or the date of delivery to the purchaser, whichever date shall fall last.

This statute by its terms extinguishes a creditor's security interest in collateral 18 months after the sale of the collateral by the debtor. We find as well, as did the district court, that Section 44–69.1's incorporation by reference

---

2. Section 25–9–306(2) provides:

Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

into Section 25–9–403(2) requires that any financing statement associated with such an agricultural lien would lapse after the 18–month period, thus subjecting that lien to the relating back mechanism of Section 25–9–403(2).[3]

■ Under North Carolina commercial law, then, on June 20, 1987, 18 months after the Meiggs' last sale to Currituck, the FmHA's security interest in the crops became unperfected as against anyone who became a "purchaser" before lapse. Moreover, by the operation of the final sentence of Section 25–9–403(2), at the moment of lapse the FmHA's lien was deemed to have been subordinate to such once-junior purchasers and lien creditors. A check of the main UCC definition section confirms that Currituck, by its purchase of the collateral, qualified as a "purchaser" within the meaning of the UCC. See N.C.GEN.STAT. § 25–1–201(32)–(33). Thus, the FmHA's security interest was unperfected as against Currituck.

■ However, our inquiry under the UCC cannot stop here, as none of the foregoing provisions determines the relative priorities of Currituck and the FmHA in the collateral following the lapse and relating back of the FmHA's unperfected security interest. Not all persons asserting an interest in collateral have rights superior to a prior, though unperfected, security interest; Section 25–9–301 addresses that subject. Relevant here are the following provisions:

(1) [A]n unperfected security interest is subordinate to the rights of:

. . . . .

(c) in the case of goods, instruments, documents, and chattel paper, a person who is not a secured party and who is a transferee in bulk or other buyer not in ordinary course of business *or is a buyer of farm products in ordinary course of business, to the extent that he gives value and receives delivery of the collateral with-*

*out knowledge of the security interest and before it is perfected.*

N.C.GEN.STAT. § 25–9–301(1) (emphasis added). To determine whether Currituck's interest is superior to that of the FmHA, we must look to the UCC definitions of two important terms contained in Section 25–9–301(1)(c): a buyer "in ordinary course of business" and "without knowledge" of the prior security interest.

We are satisfied that, under the facts as pleaded by the FmHA, Currituck was a buyer of the collateral in the ordinary course of business without knowledge of FmHA's security interest. Section 25–1–201(9) defines "Buyer in ordinary course of business" as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ." We think it clear from the allegations in the complaint that the Meiggs, being farmers, were in the business of selling corn and soybeans and that the sale to Currituck, a grain dealer, was in ordinary course.

The FmHA's own allegations also show that Currituck satisfied the "good faith" and "without knowledge" requirements, the latter of which, of course, is repeated in Section 25–9–301(1). Section 25–1–201(19) provides that good faith under the UCC "means honesty in fact in the conduct or transaction concerned." The FmHA does not allege that Currituck purchased the Meiggs' grain with any dishonest motive; thus we must assume it acted in good faith as to the transaction. As for whether Currituck had "knowledge" of the FmHA's security interest, we look to Section 25–1–201(25), which tells us that "knowledge" means actual knowledge of the fact in question. The FmHA makes no allegation that Currituck had actual knowledge of its security interest at the time of the purchase of the Meiggs' grain. Thus, despite the fact that the FmHA's financing statement was proper-

---

**3.** Though the record does not disclose the precise date upon which the FmHA filed its financing statements, we may infer that at the time this suit was filed, over five years had elapsed since those documents were filed. The loans in question were made sometime in 1985, and the suit was

filed in 1991. Thus, the financing statements would have lapsed and the security interests by virtue of relating back would have become unperfected even without reference to the 18–month period in N.C.G.S. § 44–69.1.

ly on file in the appropriate county office, Currituck has not been shown to have had knowledge of the security interest within the meaning of the UCC. Cf. N.C.GEN.STAT. § 25–1–201(25)(c) ("A person has 'notice' of a fact when from all the facts and circumstances known to him at the time in question he has reason to know it exists."). Accordingly, we concur with the district court's determination that Currituck's interest in the grain was superior to that of the FmHA.

■ Next we consider the effect of the relating back of the subordination of the FmHA's security interest on its cause of action in conversion against Currituck. North Carolina law provides to secured creditors the remedy of conversion where a third party or junior lienholder asserts ownership and control over collateral contrary to the secured party's superior interest. See *Wall v. Colvard*, 268 N.C. 43, 149 S.E.2d 559, 563–64 (1966); *Federal Deposit Ins. Corp. v. Loft Apartments Ltd. Part.*, 39 N.C.App. 473, 250 S.E.2d 693, 695, *cert. denied*, 297 N.C. 176, 254 S.E.2d 39 (1979). The district court held, however, that the subordination of the FmHA's security interest extinguished its cause of action in conversion against Currituck. We agree, as we are of opinion that the invalidity destroyed a fundamental prerequisite of FmHA's conversion suit.

■ To maintain a suit for conversion the plaintiff at the time of the disputed sale must have had a right to possession of the property superior to that of the alleged converter. See *Boyce v. Williams*, 84 N.C. 275, 276–77 (1881); Restatement (Second) of Torts §§ 225, 272 (1964); 18 Am.Jur.2d *Conversion* § 96 (1985); 89 C.J.S. *Trover and Conversion* § 92 (1955). Moreover, a plaintiff in conversion must maintain that superior possessory interest through the time of suit; a sale or other loss of that possessory interest extinguishes that party's cause of action for conversion. See 18 Am.Jur. *Conversion* §§ 59, 75.

As we have demonstrated above in some detail, by the time the FmHA brought this action, in 1991, under North Carolina law Currituck's interest in the collateral was and always had been superior to that of the FmHA. Thus, the substantive commercial law of North Carolina deprived the FmHA of an action for conversion against Currituck.

Though the case law on the point is sparse, every published decision which has come to our attention has held that the relating back and subordination of an unperfected security interest under UCC §§ 9–403(2) and 9–301(1) prevents that secured party from maintaining an action in conversion against later-in-time purchasers of the collateral.[4] This is so even though in some sense the secured party's cause of action accrued for some period of time prior to the lapse of time required. See *United States v. Hansen*, 678 F.Supp. 254 (D.Utah 1988); *United States v. Central Livestock Corp.*, 616 F.Supp. 629 (D.Kan. 1985); *United States v. Bailey Feed Mill, Inc.*, 592 F.Supp. 844 (E.D.N.C.1984) (addressing N.C.GEN.STAT. § 44–69.1); *United States v. Squires*, 378 F.Supp. 798 (S.D.Iowa 1974); *Hanley Implement Co., Inc. v. Riesterer Equipment, Inc.*, 150 Wis.2d 161, 441 N.W.2d 304 (Ct.App.1989); *Growth Properties v. Lempert*, 144 Cal.App.3d 983, 193 Cal.Rptr. 102 (1st Dist.1983). So this case law confirms our reading of North Carolina commercial law.

■ The effect of North Carolina law largely disposes of the FmHA's primary argument in this case. The FmHA asserts that upon Currituck's purchase of the grain from the Meiggs a cause of action in conversion accrued in favor of the FmHA, and that once that cause of action accrued it became indestructible and was not affected by the invalidity because of passage of time and subordination of the underlying security interest. Thus, the FmHA argues, the only limitation placed upon its ability to prosecute the conversion action is the applicable statute of limitations. As state statutes of limitation generally are inapplicable to the federal gov-

---

4. We note that two unpublished decisions of this court, *United States v. Cotton Growers Warehouse, Inc.*, 813 F.2d 403 (4th Cir.1986), and *United States v. M.E. Edwards & Son, Inc.*, 935 F.2d 1288 (4th Cir.1991), at least by implication reject this application of North Carolina law. Those opinions are not binding, and we decline to follow their reasoning so far as they are contrary to this decision.

ernment, see *United States v. Summerlin*, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940), the FmHA concludes that its action was timely under the six-year federal statute of limitations for conversion of government property, 28 U.S.C. § 2415(b).

This argument, we think, misses the mark. Statutes of limitation become relevant only where a right to recovery exists under applicable substantive law. Under North Carolina substantive law, as we have shown, the FmHA has no right to recovery against Currituck. Thus, adoption of a uniform federal rule favoring the government in this case would involve far more than the mere application of an existing federal statute of limitations in the face of a conflicting state limitations period; rather, we would have to fashion a federal common law rule displacing state substantive law and preserving the priority of the FmHA's security interest even where the government fails to comply with state perfection requirements.

While certainly it is within the power of the federal courts to fashion such a dispensation in favor of federal agencies, see *Kimbell Foods* and *Clearfield Trust, supra*, we are of opinion that the Court's decision in *Kimbell Foods*, and cases following, prevent us from doing so. In *Kimbell Foods* the Court considered two cases involving disputes over the relative priorities of the liens of federal agencies in collateral as against competing liens held by private creditors. After affirming that federal common law ultimately controlled the rights and duties of federal agencies involved in government loan programs, the Court considered whether the rule of decision regarding such priority questions should be supplied by the otherwise-applicable state law or by a judge-made federal rule.

The *Kimbell Foods* opinion identified three factors relevant to the decision between incorporation of state rules and creation of uniform federal rules. First, a court must consider the need for nationwide uniformity inherent in the specific federal program in question. "[F]ederal programs that 'by their nature are and must be uniform in character through the Nation' necessitate formulation of controlling federal rules," while "when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision." *Kimbell Foods*, 440 U.S. at 728, 99 S.Ct. at 1458 (citations and footnote omitted). Second, the court "must also determine whether application of state law would frustrate specific objectives of the federal programs" involved. 440 U.S. at 728, 99 S.Ct. at 1458. Third, the "choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." 440 U.S. at 729, 99 S.Ct. at 1459.

We need not conduct a lengthy analysis of these factors as applied to the instant case, for we think *Kimbell Foods* so analogous to the dispute between the FmHA and Currituck that the same result should obtain here. The Court in *Kimbell Foods* held that state commercial law should be adopted as the federal rule of decision in such disputes involving the rights of federal agencies acting as lenders. To quote the Court:

> We are unpersuaded that, in the circumstances presented here, nationwide standards favoring the claims of the United States are necessary to ease program administration or to safeguard the Federal Treasury from defaulting debtors. Because the state commercial codes furnish convenient solutions in no way inconsistent with adequate protection of the federal interests, we decline to override intricate state laws of general applicability on which private creditors base their daily commercial transactions.
>
> . . . .
>
> The Government therefore is in substantially the same position as private lenders, and the special status it seeks is unnecessary to safeguard the public fisc. . . . [W]e agree with the Court of Appeals … that as a quasi-commercial lender, the Government does not require the special priority which it compels as sovereign in its tax collecting activity.
>
> . . . .
>
> Accordingly, we hold that, absent a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws.

*Kimbell Foods,* 440 U.S. at 729, 737, 740, 99 S.Ct. at 1459, 1463, 1464 (citations and internal quotations omitted); see also *United States v. Tugwell,* 779 F.2d 5, 7 (4th Cir. 1985); *United States v. Friend's Stockyard, Inc.,* 600 F.2d 9, 10 (4th Cir.1979); *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232, 1239 (3d Cir.1986); *United States v. S.K.A. Assoc's, Inc.,* 600 F.2d 513, 514 (5th Cir.1979); but see *United States v. Missouri Farmers Ass'n, Inc.,* 764 F.2d 488, 489 (8th Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986).

At bottom, this case is a priority dispute between Currituck and the FmHA acting as a lender in the private credit market. We think the clear import of *Kimbell Foods* is that, absent congressional direction to the contrary, nondiscriminatory state commercial law applies to such federal lenders. There being no argument that North Carolina lien law discriminates against the federal government, we hold that the district court correctly adopted that law as the federal rule of decision and dismissed this action. Indeed, *Tugwell* and *Friend's Stockyard* from this circuit are so nearly on all fours as to be persuasive as to, even if they do not require, the result obtained in this decision.

The judgment of the district court is AFFIRMED.