**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**WINTER LIVESTOCK COMMISSION,**
**Defendant–Appellant.**

**No. 85–2788.**

United States Court of Appeals,
Tenth Circuit.

Jan. 31, 1991.

Jerry R. Atencio, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., with him on the brief), for plaintiff-appellee.

Wiley Y. Daniel of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo. (Arun Das of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., Barton Brown of Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., and

James T. Malysiak of Freeman, Freeman & Salzman, P.C., Chicago, Ill., were with him, on the brief), for defendant-appellant.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and SAFFELS, District Judge *.

HOLLOWAY, Chief Judge.

The United States District Court, District of Colorado, granted summary judgment in favor of plaintiff United States of America (Government) in an unpublished order. Defendant Winter Livestock Commission (Winter) appeals.

This action involves a conversion claim against Winter by the Government. The Government charges that Winter is liable for the fair market value of cattle sold through Winter's facilities for Danny L. and Pamela Plagge who obtained loans from the Farmers Home Administration (FmHA), giving the FmHA a security interest in the cattle. We affirm the grant of summary judgment on Winter's liability for conversion, but remand for a determination of damages.

I

The record confirms the district court's account of the facts as accurate and essentially undisputed. In summary, the Plagges received four loans in 1979 and 1980 for $111,200, $13,200, $78,000 and $54,660. The security interest in the Plagges' livestock was properly executed and perfected with a proper filing of the financing statement. The terms of the security agreement required written consent from the FmHA before the collateralized livestock could be sold or transferred.[1]

On five separate occasions between July 29, 1980 and July 21, 1981 the Plagges sold cattle through Winter's services. After deducting charges for its services, Winter issued checks to the Plagges for the sum total of $65,712.77.[2] The Plagges never brought any of these proceeds into the Springfield FmHA office, and none of the proceeds were applied to repay the loan.

After these sales the Plagges filed a Chapter 7 bankruptcy petition. Some time later the Government executed a settlement agreement with them, reserving its right to obtain the balance of the Plagges' outstanding debt from any and all third parties. The Government then sued Winter in this action charging conversion. Winter claims that it had no actual knowledge that the livestock served as the security interest for the FmHA lien.

The district court granted summary judgment for the Government. Based on the regulations as the governing federal law, the court found there was no FmHA consent, authorization, or approval of the sale and that the FmHA's lien continued beyond the sale so as to make Winter liable. Winter timely appealed.

II

Under the principles of the Supreme Court's decision in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), federal law governs with respect to claims arising from the FmHA program, but incorporates, absent congressional directives otherwise, nondiscriminatory state law. The parties' real dispute here is over the content of the federal law governing this case.[3]

---

* The Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

1. We note also that the loan agreement stated that the Plagges "agree[d] not to make any capital purchases or contract for other credit without the consent of the FmHA and further agree not to use proceeds from the sale of mortgaged property ... for any purpose without the consent of FmHA." Wycock Deposition Ex. 10.

2. At this juncture we note that the district court's assessment of damages was in error, as both parties agree that the Government's stated

damage amount, listed as $65,842.40, should instead have read $65,712.77. Appellee–Government's Brief at 2. Because of our disposition of this case, this error is rendered moot.

3. The Government argues that the content is the federal regulations promulgated by the FmHA, specifically 7 C.F.R. §§ 1962.17 and 1962.18 (1979). Since the Plagges failed to comply with the regulations requiring sale approval and adequate accounting before release of the lien, the FmHA security lien continued beyond the unauthorized sales, making Winter liable for conversion.

This Court abated proceedings on this appeal pending our *en banc* decision in *FDIC v. Bank of Boulder*, 911 F.2d 1466 (10th Cir.1990), which involved the application of *Kimbell.* We now have supplemental briefs on *Bank of Boulder.* There plaintiff-FDIC sought to enforce a standby letter of credit previously issued to Dominion Bank of Denver by Defendant–Bank of Boulder. Dominion Bank's insolvency resulted in transfer of the letter first to FDIC/Receiver, and then to FDIC/Corporation. The Bank of Boulder refused to honor the letter because Colorado law barred its transfer. As an alternative to our federal preemption analysis, this Court held that although Colorado law specifically provided that the letter of credit was non-assignable, "federal common law requires a uniform rule of transferability of letters of credit to FDIC/Corporation [from FDIC/Receiver] in the course of [Purchase and Assumption] transactions." *Id.* at 1474. Thus, for purposes of that dispute, federal common law became the content of the federal law under *Kimbell.*

The parties continue to urge that we decide, as a general rule for this circuit, whether federal regulations or the state UCC constitutes the content of federal law for government initiated conversion claims. On reflection, however, we believe that on this record, our *Bank of Boulder* decision is not dispositive of the real issue present-ed here, that of the FmHA's consent. We need not enter the inter-circuit conflict[4] since that is unnecessary and an alternate approach adequately resolves the instant dispute. Accordingly, we need not resolve the regulation versus UCC conflict, because under either approach, the defendant must demonstrate that the FmHA gave actual or implied consent which ultimately terminated the Government's security lien.

The district court held here that no consent occurred. As shown below, we also conclude that Winter has not carried its burden to raise a reasonable inference of FmHA consent, and thus has failed "to make a showing sufficient to establish the existence of an element essential" necessary to overcome the Government's motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Putting aside the *Kimbell* choice of law question, the parties' arguments distill down to the following: Winter asserts that there was implied or actual consent given for the first two sales, and that it would be inequitable to hold them on constructive notice of the final three sales because the recording system is flawed and would not have revealed the lien, had proper inquiry been made. Even if no consent occurred, the proceeds were adequately applied in the

---

Winter argues that the content of the applicable federal law is the Colorado Uniform Commercial Code (UCC), incorporated as mandated by *Kimbell*, 440 U.S. at 740, 99 S.Ct. at 1464 (absent congressional directives, the priority of FmHA liens is to be determined by nondiscriminatory state laws). Under that state law, Winter's defense is that the FmHA consented to the sales by a course of dealing and performance. This consent extinguished the Government's security interest. Colo.Rev.Stat., §§ 4–1–205, 4–2–208, 4–9–306(2) (1973).

**4.** The district court in this instance relied upon *United States v. New Holland Sales Stable, Inc.*, 603 F.Supp. 1379 (E.D.Pa.1985), in holding that the federal regulation constitutes the governing federal law. *New Holland* has since been reversed by the Third Circuit Court of Appeals, which determined that state UCC law forms the content of the federal law in cases involving FmHA farm loan security interests. *United States v. Walter Dunlap & Sons, Inc.*, 800 F.2d 1232 (3rd Cir.1986). *Compare United States v.*

*Tugwell*, 779 F.2d 5 (4th Cir.1985) (pursuant to *Kimbell*, state UCC is the content of federal law; *contra United States v. Missouri Farmers Association, Inc.*, 764 F.2d 488 (8th Cir.1985) (FmHA regulations govern the release of liens in accord with *Kimbell* guideline to protect federal interest); *but see United States v. Progressive Farmers Marketing Agency*, 788 F.2d 1327 (8th Cir.1986) (in absence of federal law, *Kimbell* is followed to apply state law as content of federal law).

Tenth Circuit decisions after *Kimbell* have not decided the content issue for Government conversion claims. *See, e.g., United States v. Lattauzio*, 748 F.2d 559 (10th Cir.1984) (state UCC is content of federal law in Small Business Administration loan action); *In Re Murdock Machine and Engineering Co. of Utah*, 620 F.2d 767 (10th Cir.1980) (state UCC constitutes the controlling federal law in case involving seller's rights in federal project dispute).

second sale in accordance with federal regulations; thus the lien was released or attached to replacement collateral held by the Plagges. Moreover, the sale was not the proximate cause of injury, but rather the injury was caused by later misapplication of the proceeds by Plagge.

The Government's position is that Winter was on constructive notice of FmHA's lien for all five sales. In any event, the County Supervisor was without authority to release any liens where the proceeds were not applied as required by federal regulations. With respect to the second sale, even assuming that the proceeds were adequately applied sufficiently to empower the County Supervisor to release the lien, there remains a deficiency unaccounted for in the repurchase of cattle. The conversion occurred when Winter ignored FmHA's security interest and released the cattle proceeds solely to Plagge.

### I. *Consent and Release.*

■ The district court found that the Springfield office procedures for releasing liens on serviced FmHA loans were as follows:

[I]n practice, the FmHA did not require prior written consent before a borrower could sell collateral. The FmHA did require, however, that the borrowers bring the proceeds in to the FmHA office, whereupon the FmHA would review the sale and apply the proceeds either to the amounts due on the borrowers [sic] loans, or release some of the proceeds for other allowable purposes, such as the purchase of replacement collateral. ... This approval of sale and release of proceeds constitutes a release of the government's lien. ... Absent such approval, however, both the sold property and the proceeds from sale remain subject to the lien.

*United States v. Winter Livestock Commission Co.*, No. 85–F–455 (D.Colo. Sept. 30, 1985)(Unpublished Order) at 2 (citations omitted).

Winter challenges this view of the Springfield office's release procedure, contending instead that the practice of the FmHA was to acquiesce in any sales referred to in the Farm and Home Plan, thereby constituting a release under the UCC. According to Winter,

[i]t is clear from the actions and conduct of the FmHA that Plagge had authority to sell the collateral subject to his duty to account for the proceeds. Any argument that Plagge never fully accounted for the proceeds is irrelevant because *consent for the sale existed* and the government security interest terminated at the time of the sale.

Brief of Appellant at 32 (citation omitted)(emphasis added). We do not agree with this view of FmHA lending practices, which is unsubstantiated.

The record facts, and simple business sense, contradict Winter's concept of a pre-approved release of FmHA's security interests. The Plagges' Farm and Home Plan was completed as part of their loan application. Wysock Deposition at 54. An examination of the plan plainly shows it to be only a prediction of how the the parties expected the business to be operated. The fact that a column for *actual* (in addition to predicted) transactions is provided on the plan form shows that the plan was meant as a predictive worksheet only, and therefore cannot constitute specific consent on specifically secured collateral by the FmHA. It is inconceivable that FmHA would make a loan, require a security interest in property purchased, and then immediately place the power to release that interest back into the borrower's hands, without even requiring notice of the collateral's disposition. Without stronger evidence to support Winter's view, which directly contradicts the express terms of the security agreement and the affirmative statements of an FmHA official, see Kasselder Deposition at 28–33, we accept the district court's holding that borrowers were expected to report sales and properly account for the proceeds, and that any release was based on this notification and accounting procedure.

■ Having determined the procedure required, we examine the specific sales. The first disputed transaction was a sale of

15 "cull cows" (i.e., cows which are no longer productive) on July 29, 1980, for $5502.75. There is no evidence indicating that this sale was ever reported to the FmHA, much less approved, except for a conclusory statement in Plagge's affidavit that the "FmHA were aware of and approved of the sale of the 15 cull cows." Plagge Affidavit at 2, ¶ 6. Plagge and Winter Livestock rely on the Farm and Home Plan, Wysock Deposition Ex. 9, which indicates that fifteen cull cows were "planned to be sold," as Plagge's affidavit put it. However, as explained above, this Plan cannot constitute notice of the sale or its approval because the plan was merely a predictive tool. There is no evidence at all that the FmHA was ever aware of the actual sale, nor has Winter presented evidence specifying the ultimate use of the proceeds. Thus, summary judgment for the Government on this transaction was appropriate.

■ The same is true with respect to the last three cattle sales (dated March 3, July 14, and July 21, 1981). These sales were made under the name "Plagge Farms" rather than under the name Danny Plagge. Keffeler Affidavit at 1.[5] Like the first one, there is no indication that Plagge ever notified the FmHA of these transactions, or ever applied the proceeds to a permissible purpose. Plagge does not specifically mention these sales in his affidavit. Apparently, the FmHA discovered them only by examining Winter Livestock's sales logs. Kasselder Deposition at 52–54; Finkner Deposition at 75–77; Finkner Deposition Ex. 5. Winter Livestock does not argue that these sales were approved specifically, except to say that all sales were approved because the FmHA did not require prior or written consent. However, we do not agree that consent was not needed. Notification and accounting were always expected under the office's procedures. We believe that given the dearth of evidence presented relating to these sales, a reasonable finding cannot be made that the FmHA consented. Thus, there is no genuine issue of material fact and the grant of summary judgment was also appropriate on these last three cattle sales.

■ The second and largest sale, dated October 21, 1980, for $53,440.44, involved 175 head of cattle. This sale gives us some pause. Unlike the other sales, there is uncontested evidence in the agency's "running record," as well as deposition testimony, that FmHA Assistant County Supervisor Laner, now deceased, was informed of this transaction. Wysock Deposition Ex. 12; Finkner Deposition at 71–74; Finkner Deposition Ex. 4. The transaction was recorded on the FmHA's security disposition sheet, but there is no indication that it was either approved or disapproved.[6] The government points to this as evidence that the sale was "expressly disapproved," Government's Brief at 14, and in fact deposition testimony indicated that the last column was probably left blank for that reason. Finkner Deposition at 43–44. However, given the FmHA's less than consistent record-keeping practices, see Christopher Deposition at 47, and taking the facts in the light most favorable to Winter, we do not believe that an inference favoring the Government can be so drawn of express disapproval.

The analysis must then focus on whether the sale was authorized. Clearly, the Plagges failed to abide by the terms of the security agreement by not obtaining written consent before sale. But just as clear-

---

5. According to the affidavit, one of the sales was made by "Ragge Farms." However, upon looking at the receipt, which is difficult to read, we believe it also says "Plagge." Keffeler Affidavit Ex. A.

6. On the copy made available to us, there is no indication of any approval or disapproval. Wysock Deposition Ex. 12. However, some testimony suggests that on the original copy, a "no" is written in the approval column. Wysock Deposition at 99–100; Christopher Deposition at 45; *but see* Finkner Deposition at 43 (noting that the approval column is blank). Even if "no" appears on the form, it is unclear how long ago it was written, Christopher Deposition at 45, or who wrote it. *Compare* Wysock Deposition at 99–100, *with* Christopher Deposition at 45. Viewing the evidence in the light most favorable to Winter Livestock, *Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1437 (10th Cir.1987), we will treat the approval column as being blank.

ly, the practice in the Springfield office did not always require prior written consent. Winter argues that the authorization for this sale was implied, under Colorado law. Brief for Appellant at 31–32. The Government, on the other hand, argues that compliance with the federal regulations is a pre-condition to the County Supervisor's exercise of the power to release sufficient to bind the government. Brief of Appellee at 6–9. We conclude that under either view Winter must lose, and therefore summary judgment was proper for the Government on the second sale.

Under the terms of 7 C.F.R. § 1962.17(a)(b) in effect at the time of the Plagge loans, the cattle were categorized into basic security (foundation herd) and normal income security (such as calves). The regulation provided that the FmHA County Supervisor "may release" basic security "when the property has been sold or exchanged" and the proceeds are either applied to the loan, or used to buy replacement security to which the lien attaches. Normal income security may be released only when sold at fair market value and the proceeds are applied to approved farm and home expenditures, or other designated purposes. *Id.* Moreover, as the Government notes, the ability of a government official such as the County Supervisor to bind the Government arises only where there has been strict compliance with the authority delegated. *See generally, Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Albrechtsen v. Andrus,* 570 F.2d 906, 910 (10th Cir.), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). The evidence shows that the Plagges did not comply with the regulations by applying all proceeds to the loans or to other permissible uses. Accordingly, the County Supervisor was without power to authorize the sale and release the lien, and any unauthorized transfer was an unlawful conversion.

Under Colorado law, the result would be no different. Colorado's version of the UCC provides that:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Colo.Rev.Stat.1973, § 4–9–306(2). Notably, the Colorado UCC does not define "authorized." But we need not delve into the intricacies of Colorado agency law to resolve this case because at least one Colorado court has applied § 4–9–306(2) to a claim of implied consent. *See Western Nat'l Bank of Casper v. ABC Drilling Co., Inc.,* 42 Colo.App. 407, 599 P.2d 942 (1979). To paraphrase the Colorado Court of Appeals in *ABC Drilling:* the evidence here reveals that at most the FmHA would have consented to the sale only if the Plagges had brought in the proceeds for application to the FmHA loans. *Id.* 599 P.2d at 945; *see also Southwest Washington Prod. Credit Ass'n v. Seattle–First Nat'l Bank,* 92 Wash.2d 30, 593 P.2d 167, 169 (1979) (*en banc*) (holding that the UCC permits conditioning the authorization to sell on a specified application of the proceeds).[7] Since the uncontested evidence shows that none of the proceeds from this sale were applied

---

7. We are aware that this court distinguished the *Seattle–First* case in coming to a contrary conclusion while construing Oklahoma's version of UCC § 9–306(2). *See First Nat'l Bank and Trust Co. of Oklahoma City v. Iowa Beef Processors, Inc.,* 626 F.2d 764, 768–69 (10th Cir.1980). Although the Oklahoma and Colorado versions of § 9–306 are identically worded, we do not believe that *Iowa Beef* controls. The *Seattle–First* case was distinguished in *Iowa Beef* primarily because it, as in the instant case, involved a security agreement requiring written consent before the sale of collateral. *Id.* Moreover, in *Iowa Beef,* the plaintiff-bank conceded that "[T]he borrowers had standing consent to sell cattle." *Id.* at 767. In light of the difference in attitudes toward collateral sale, and the different approaches to the UCC of the respective state courts, a differing view of Colorado's § 9–306 is permissible. *Iowa Beef* applies Oklahoma law, and to the extent that the Colorado court in *ABC Drilling* construes the UCC to permit such restraints on authorization, we would follow this lead were Colorado law dispositive here.

to the FmHA loan, there was no consent and release, and summary judgment as to Winter's liability for conversion was appropriate.

▮ Winter contends, however, that Plagge deposited the proceeds in his personal bank account, and a few weeks after this second sale, replaced the sold cattle. *See* Plagge Affidavit at 2 (stating that replacement cattle "purchases were in the approximate amounts of $17,460, $11,160, and $6,300"). Consequently, Winters argues, its liability should be reduced by $34,920 in any event. The Government responds that this claim is "uncorroborated" and even if true, leaves a shortfall of nearly $18,500 unaccounted for. For these reasons we believe that with respect to the damages, but not the liability for conversion, there exists a genuine issue of material fact as to alleged purchases of replacement cattle to which the FmHA's lien would have attached, which would reduce Winter's liability. Thus, summary judgment on the amount of damages only was improper and on that issue we remand.

II. *Course of Dealing, Inequity, Conversion and Ignorance.*

▮ Winter's remaining arguments are unpersuasive. Winter claims that a course of dealing between the FmHA and the Plagges made consent unnecessary. We have already refuted this argument above, outside the UCC context. But even assuming that the Colorado UCC governs, Winter's argument fails under the very terms of the UCC provisions cited.

First, the statute and official comment to the course of dealing provision restrict this defense "literally to a *sequence of conduct* between the parties *previous* to the agreement." Colo.Rev.Stat., § 4–1–205(1) and Official Comment 2 (emphasis added). Winter's factual contentions do not address this type of conduct. Second, course of performance looks to "repeated occasions" of performance by the parties *after* or under the contract, which in certain circumstances would be relevant to show a waiver

or modification of the agreement. Colo. Rev.Stat., § 4–2–208; *see also* § 4–1–205, Official Comment 2. Winter, however, fails to allege or demonstrate that the Plagges' specific conduct regarding the five sales was recurring conduct between the parties. The implied consent and consequent waiver of the security lien, authorizing conduct which could "otherwise" alter the express agreement, has not been demonstrated. Absent express or otherwise demonstrated authorization for the Plagges' conduct, the UCC mandates that the express terms of the agreement are controlling. *Id.* at §§ 4–1–205(4); 4–2–208(2).

Winter's claim that it would be inequitable to hold it accountable for the last three sales because of imperfections in the lien recording system lacks merit. We do not find it inequitable to hold a tortfeasor accountable on constructive notice of a lien which it chose to ignore, merely because the security interest "might" have been missed had Winter checked. Winter never looked; thus its argument is mere speculation.

▮ The trial court properly held that Winter had engaged in conversion through the unauthorized transfer or disposal of the livestock. *See, e.g., Cassidy Commission Co. v. United States*, 387 F.2d 875, 880 (10th Cir.1967)(placing the risk of failure to obtain release on the party receiving the secured property); *Colorado Bank and Trust Company v. Western Slope Investments, Inc.*, 36 Colo.App. 149, 539 P.2d 501, 503–504 (1975) (auction company liable in absence of clear, unequivocal, and decisive act by lender to consent to or ratify sale). Ignorance of the FmHA's lien is not a defense. Winter is liable for its actions under the terms of the UCC and federal common law. Colo.Rev.Stat., § 4–9–306(2), Official Comment 3; W.P. Keeton, D.B. Dobbs, R.E. Keeton, & D.G. Owen, *Prosser and Keeton on Torts* 96–97 (5th ed.1984) (auctioneer liable as converter notwithstanding his innocence).[8]

8. The Food Security Act of 1985, Sec. 1324, 7 U.S.C. § 1631, effective December 1986, was passed to govern situations like this case. Under the UCC, § 9–307(1), the farm products ex-

Accordingly, we AFFIRM the grant of summary judgment on liability for conversion, but REMAND for a determination of damages in accord with this opinion.

ception, the buyer in the ordinary course of business could not take free of the security interest. The Food Security Act invalidated the farm products rule in § 9–307(1) and protects commission merchants and selling agents from being held liable for conversion or held ac-

countable to the seller's secured party for the proceeds. The farm products exception is part of the Colorado UCC and would have applied at the time of the Plagges' loans and transactions with Winter. Colo.Rev.Stat., § 4–9–307(1).