RENDERED: MARCH 23, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0561-DG

MGG INVESTMENT GROUP LP      APPELLANT


V.      ON REVIEW FROM COURT OF APPEALS
NOS. 2020-CA-0434, 2020-CA-0478,
2020-CA-0821, 2020-CA-0900, 2020-CA-0960
FAYETTE CIRCUIT COURT NO. 20-CI-00248


BEMAK N.V., LTD; MULL ENTERPRISES      APPELLEES
LIMITED D/B/A YEOMANSTOWN STUD;
HILL 'N' DALE EQUINE HOLDINGS, INC.;
LNJ FOXWOODS, LLC; MCMAHON OF
SARATOGA THOROUGHBREDS, LLC;
ORPENDALE UNLIMITED COMPANY;
FLINTSHIRE FARM, LLC; and THOMAS B.
SEARS A/K/A BRAD SEARS


**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

The federal Food Security Act of 1985 ("FSA") abrogated a common exception in the Uniform Commercial Code ("UCC") that allowed for a security interest to remain when a farm product passed from seller to buyer. Primarily, this appeal raises two interconnected issues. First, the issue of whether the FSA applies when the good in question is a thoroughbred horse, in this case one with particularly valuable breeding rights. And if so, a second question arises of whether breeding rights are farm products within the FSA. Finding

the FSA clear in its meaning and preemptive of Kentucky's UCC, we hold that thoroughbreds and the right to breed them are farm products within the meaning of the FSA and as a result any security interest in those products was extinguished when they were sold to their respective buyers.

## I.  Factual and Procedural Background

The issues presented in this appeal stem from one of Kentucky's signature industries: the racing and breeding of thoroughbred horses.  MGG Investment Group LP ("MGG") entered into a financing agreement with Zayat Stables, LLC ("Zayat Stables") which is in the business of "[o]wning, raising, maintaining, buying, selling, racing, breeding and promoting horses."  *MGG Inv. Grp. LP v. Mull Enter. Ltd.*, Nos. 2020-CA-0478-MR, 2020-CA-0434-MR, 2020-CA-0821-MR, 2020-CA-0900-MR, 2020-CA-0960-MR, 2021 WL 5264189, at *1 (Ky. App. Nov. 12, 2021).  Zayat Stables' most notable thoroughbred is AMERICAN PHAROAH, winner of the 2015 Triple Crown and the only horse to ever win the Grand Slam of Thoroughbred Racing.[1]  In 2016, MGG loaned Zayat Stables $30 million secured by

> all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations, including, without limitation, all Equine Collateral.

---

[1] The informally-named Grand Slam consists of the three Triple Crown races— the Kentucky Derby, Preakness Stakes, and Belmont Stakes—as well as the Breeders' Cup Classic.  *See* Des Bieler, *Watch American Pharoah win horse racing's first-ever Grand Slam at Breeders' Cup*, Wash. Post (October 31, 2015), https://www.washingtonpost.com/news/early-lead/wp/2015/10/31/watch-american-pharoah-win-horse-racings-first-ever-grand-slam-at-breeders-cup/.

*Id.* The agreement defined "Equine Collateral" as

> all horses, stallions, mares, weanlings, foals, thoroughbred bloodstock and/or stallion shares, breeding rights, lifetime breeding rights and/or fractional interests therein, their offspring and young, both born and unborn, and/or fractional interests therein, stallion seasons and shares, and any other interests in any of the foregoing, owned by [Zayat Stables] or any of its Subsidiaries, howsoever classified, whether now owned or hereafter acquired, and including all substitutions and replacements thereof.

*Id.*

The agreement obligated Zayat Stables to report to MGG any sale of equine collateral and Zayat Stables agreed not to sell any such collateral except as permitted by the agreement. Ultimately, MGG alleges that Zayat Stables sold equine collateral in contravention of the agreement, and from those sales this matter arose. Zayat Stables sold horses and mares as well as breeding rights to various entities that are now parties to this appeal. The purchasing entities and their role in this matter are listed below.

a. Bemak N.V., Ltd. ("Bemak") does Business in the United States as Ashford Stud. AMERICAN PHAROAH has stood at Ashford Stud's Versailles farm since 2016.

b. Mull Enterprises Limited d/b/a Yeomanstown Stud ("Yeomanstown") Purchased the stallion EL KABEIR from Zayat Stables on September 20, 2017.

c. Hill 'N' Dale Equine Holdings, Inc. ("Hill 'N' Dale") purchased the mare AMERICAN CLEOPATRA from Zayat Stables on November 15, 2017.

3

d.       LNJ Foxwoods, LLC ("LNJ") purchased two of the breeding rights to AMERICAN PHAROAH from Zayat Stables and Justin Zayat on December 21, 2018.

e.       Orpendale Unlimited Company ("Orpendale") purchased 100% of the breeding qualities of AMERICAN PHAROAH, including all ownership rights following the horse's retirement from racing, from Zayat Stables on January 16, 2015.  This agreement allowed members of the Zayat family to retain certain lifetime breeding rights to AMERICAN PHAROAH.  These rights were transferrable, but subject to a right of first refusal by Orpendale.  In 2019, Orpendale exercised its right of first refusal to purchase seven of the breeding rights from Zayat Stables and the Zayat family.

f.       McMahon Of Saratoga Thoroughbreds, LLC ("McMahon") is a thoroughbred farm in Saratoga, New York.  They purchased a 50% share of the horse SOLOMINI from Zayat Stables on December 3, 2019.  Concurrently with this purchase, McMahon also purchased the other 50% of SOLOMINI from Orpendale.[2]

g.       Flintshire Farm, LLC ("Flintshire") and Thomas B. Sears ("Sears"). Sears manages Flintshire Farm collectively with the entity Flintshire.  Around March 6, 2019, Flintshire purchased the interests in the horse LEMOONA from Zayat Stables.  Initially, those interests included only breeding rights, but following

---

[2] Orpendale purchased a 50% ownership interest in SOLOMINI from Zayat Stables on January 2, 2018.  MGG was aware of this transaction and agreed to a partial lien release.

LEMOONA's retirement from racing, Flintshire obtained all interests in the thoroughbred and took possession. Flintshire later sold LEMOONA to a third party in 2020.

In January of 2020, MGG brought suit against Zayat Stables for breach of contract and fraud, seeking to recover $23 million in principal and interest owed to MGG. MGG later amended its complaint to include claims against the purchasers of the equine collateral.[3] MGG brought claims for replevin and constructive trust against Orpendale, LNJ, Hill 'N' Dale, McMahon, and Yeomanstown; claims for intentional interference with a contract against Orpendale and Bemak; and claims for unjust enrichment against Flintshire and Sears.

Prior to discovery, Orpendale, LNJ, Flintshire, Hill 'N' Dale, McMahon, and Sears moved to dismiss. The circuit court granted the motions, finding the purchases were protected by the FSA. A motion for summary judgment for Bemak was granted on similar grounds.[4] The claims against Yeomanstown were dismissed by the circuit court for procedural reasons, with a finding that the claims were barred by KRS[5] 413.242 and were beyond the statute of limitations. However, the claims against Yeomanstown were dismissed without prejudice as the circuit court found MGG may be able to invoke equitable

---

[3] MGG also brought claims against individual members of the Zayat Family. Those individuals are not parties to this appeal.

[4] Bemak had already filed an answer when the various motions to dismiss were tendered. Resultingly, Bemak moved for summary judgment on the same grounds as the other purchasers.

[5] Kentucky Revised Statutes.

5

tolling. MGG appealed the dismissal of the claims and Yeomanstown cross-appealed the circuit court's decision to dismiss without prejudice.

The Court of Appeals affirmed the circuit court in all respects, save one. Our intermediate court determined that the FSA preempted Kentucky's farm products exception and that both thoroughbreds and their breeding rights are farm products within the FSA. The court further determined KRS 413.242 acted to bar the claims against Yeomanstown until the action against the debtor, Zayat Stables, was resolved. Finally, while the court agreed that the claims against Yeomanstown were further barred by the two-year statute of limitations found in KRS 413.125, it disagreed that MGG may be able to invoke equitable tolling. The Court of Appeals reasoned that the inspection rights contained in MGG's agreement with Zayat Stables gave MGG the means of discovering Zayat Stables' malfeasance from the time it occurred. Thus, MGG "fail[ed] to identify any extraordinary circumstance *beyond its control*[.]" *MGG Inv. Grp. LP*, 2021 WL 5264189, at *9.

MGG moved for discretionary review pursuant to CR[6] 76.20,[7] which this Court granted.

## II. Standard of Review

"Since a motion to dismiss for failure to state a claim upon which relief may be granted is a pure question of law, a reviewing court owes no deference

---

[6] Kentucky Rules of Civil Procedure.

[7] The provisions of CR 76.20 are now contained in Rule of Appellate Procedure ("RAP") 44.

to a trial court's determination; instead, an appellate court reviews the issue de novo." *Gregory v. Hardgrove*, 562 S.W.3d 911, 913 (Ky. 2018) (quoting *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010)). In ruling on a motion for failure to state a claim, the trial court should take all the allegations in the complaint as true and not dismiss "unless the pleading party appears not to be entitled to relief under any set of facts which could be proven in support of his claim." *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 651 (Ky. 2019) (quoting *Morgan v. Bird*, 289 S.W.3d 222, 226 (Ky. App. 2009)). "[T]he question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?" *Fox*, 317 S.W.3d at 7.

Similarly,

> The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The trial judge must view the evidence in a light most favorable to the nonmoving party, resolving all doubts in its favor. Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions.

*Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (internal citations and quotation marks omitted).

### III.    Analysis

This appeal asks us to examine a two-part question as to all Appellants save Yeomanstown: (1) Does the FSA preempt the traditional exception for farm

products found in Kentucky's version of the UCC, and (2) if so, are thoroughbred horses and their breeding rights farm products under the FSA.[8] As to Yeomanstown, we must resolve two independent questions: (1) are the claims against Yeomanstown barred by KRS 413.242, and (2) is MGG entitled to equitable tolling of KRS 413.125.

## A. The FSA Preempts Kentucky's Farm Products Exception.

Kentucky, as with many other states, has long provided that a buyer in the ordinary course of business, "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." KRS 355.9-320(1). However, this provision also contains an exception for buyers of farm products from a person engaged in farming operations. Pursuant to the farm products exception, a security interest attached to a farm product survives the sale and remains with the good sold.

In 1985, Congress, in direct response to the farm products exception, enacted the FSA "to remove such burden on and obstruction to interstate commerce in farm products." 7 U.S.C.[9] § 1631(b). Accordingly, the FSA abrogated the farm products exception and provided, "a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller,

---

[8] MGG appears to concede that Zayat Stables was an entity involved in farming operations and that the various purchasers of the equine collateral were buyers in the ordinary course of business. Accordingly, the only question that remains for this court is whether the FSA applies to thoroughbreds.

[9] United States Code.

8

even though the security interest is perfected; and the buyer knows of the existence of such interest."  7 U.S.C. § 1631(d).

Congress possesses the power to preempt state law through express language in a statute.  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).  "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *CSX Tranport., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Congress spelled out in the statute what it intended to accomplish.  The statute is designed to address "certain State laws [that] permit a secured lender to enforce liens against a purchaser of farm products," 7 U.S.C. § 1631(a)(1), and to protect purchasers from "double payment for the products, once at the time of purchase, and again when the seller fails to repay the lender[.]" 7 U.S.C. § 1631(a)(2).  Crucially, Congress intended the act to have effect "*notwithstanding any other provision of Federal, State, or local law*[.]"  7 U.S.C. § 1631(d) (emphasis added).

We find it clear from the language of the FSA that Congress intended to preempt the farm products exception of Kentucky's UCC.  The language of the statute explicitly addresses situations in which purchasers of farm products take subject to a lien and its purpose being to extinguish that lien with some exceptions not relevant here.  In other words, the FSA was designed precisely to preempt the farm products exception, "notwithstanding. . . State, or local law[.]"  7 U.S.C. § 1631(d).

9

This conclusion is consistent with that of courts beyond this Commonwealth. *See, e.g., United States of America v. Winter Livestock Comm'n*, 924 F.2d 986, 993 n.8 (10th Cir. 1991) (noting preemptive effect of FSA on conversion claims); *State Bank of Cherry v. CGB Enters.*, 964 N.E.2d 604, 608 (Ill. App. Ct. 2012) ("Section 1631(d) is a clear expression of an intent to preempt state law[]"); *First Nat'l Bank & Trust v. Miami County Coop. Ass'n*, 897 P.2d 144, 151 (Kan. 1995) ("[The FSA] preempts the Kansas Uniform Commercial Code provisions and any other federal, state, or local law governing security interests in agricultural products and production of agricultural products[]"); *Fin-Ag, Inc. v. Cimpl's, Inc.*, 754 N.W.2d 1, 7 (S.D. 2008) ("[The FSA] preempt[s] UCC provisions and create[s] a general rule protecting buyers in the ordinary course of business who purchase farm products subject to a lender's security interest[]").

MGG argues that KRS 355.9-102(1)(ah) evinces Kentucky's intent to remove thoroughbreds from the FSA. That statute provides,

> "Farm products" means goods, other than standing timber, with respect to which the debtor is engaged in a farming operation and which are… Equine interests, including, but not limited to, interests in horses, mares, yearlings, foals, weanlings, stallions, syndicated stallions, and stallion shares (including seasons and other rights in connection therewith), whether or not the debtor is engaged in farming operations and without regard to the use thereof. If goods are farm products, they are neither equipment nor inventory[.]

KRS 355.9-102(1)(ah)(5). MGG points to the differences between the FSA and the statute, specifically the FSA's requirement that the seller be engaged in farming operations, and that the FSA is more narrowly focused. Ultimately,

10

MGG argues a change in Kentucky law does not correspondingly expand federal law.

We find MGG's arguments unavailing. KRS 355.9-102(1)(ah)(5) and its predecessor KRS 355.9-109(3)(b)[10] were intended to clarify an issue that had bedeviled the thoroughbred industry since the introduction of the UCC: how to classify equine interests under the UCC. Prior to the 1990 amendment to KRS 355.9-109, horses could fall into different categories as collateral depending on the status of the owner. Thus, a horse could be considered equipment, inventory, or a farm product depending on the activity of the owner. Further, practitioners were advised that horses used in racing could lose their status as farm products even where the individual or entity racing the horse was also engaged in farming activities (unless the racing and farming activities could be adequately connected). R. David Lester, *Security Interests in Thoroughbred and Standardbred Horses: A Transactional Approach*, 70 Ky. L. J. 1065, 1089 (1982). KRS 355.9-109(3)(b) solved the narrow problem of how horses were classified, but it did not simultaneously carve thoroughbreds out of the FSA and reapply the farm products exception. Assuming, *arguendo*, that MGG is

---

[10] Prior to its repeal and reenactment in 2000, KRS 355.9-109(3)(b) addressed the classification of goods and provided that farm products were to include

> equine, including but not limited to, interests in horses, mares, yearlings, foals, weanlings, stallions, syndicated stallions and stallion shares (including seasons and other rights in connection therewith), whether or not the debtor is engaged in farming operations and without regard to the use thereof. If goods are farm products they are neither equipment nor inventory[.]

KRS 355.9-109(3)(b) (1999).

11

correct, we would still be left with the same issue but flowing in the opposite direction: that KRS 355.9-102(1)(ah)(5) provides no limit on what is considered a "horse." This omission would make the carve-out apply not only to thoroughbreds, but to all horses. Because the language of the FSA makes clear its preemptive effect, and because horses are listed within the FSA, this would leave us in the same position as we are now, tasked with determining the scope of the definition of "horse."

We need not engage in such a task, however, because we find KRS 355.9-102(1)(ah) merely clarifies how equine collateral is classified and did not return the farm products exception to such collateral. There being no carve-out of the preemptive effect of the FSA with regard to thoroughbreds, we next must determine if thoroughbreds are considered farm products within the scope of the FSA.

**B. Thoroughbreds are farm products under the FSA.**

MGG argues the intent of Congress was for the FSA to apply only to agricultural commodities, a category which may include many kinds of horses, but not thoroughbreds. If MGG is correct, then the FSA would not apply to the thoroughbreds at issue and the farm products exception would protect MGG's security interests.

MGG's argument revolves around the FSA's definition of "farm product" which states,

> The term "farm product" means an agricultural commodity such as wheat, corn, soybeans, or a species of livestock such as cattle, hogs, sheep, horses, or poultry used or produced in farming operations, or a product of such crop or livestock in its

12

unmanufactured state (such as ginned cotton, wool-clip, maple syrup, milk, and eggs), that is in the possession of a person engaged in farming operations.

7 U.S.C. § 1631(c)(5). MGG posits that the use of the phrase "agricultural commodity" encompasses "a species of livestock such as . . . horses." Under this interpretation, only horses that are agricultural commodities are covered by the FSA. This would exclude thoroughbreds, according to MGG, as they are too exceptional to fall under the definition of a commodity.

"When engaging in statutory interpretation, it is imperative that we give the words of the statute their literal meaning and effectuate the intent of the legislature." *Samons v. Ky. Farm Bureau Mut. Ins. Co.*, 399 S.W.3d 425, 429 (Ky. 2013). We interpret this provision to mean that Congress did not place any such limiting factor upon "horses." The plain language of 7 U.S.C. § 1631(c)(5) sets forth three categories of goods that the FSA considers "farm products": (1) "an agricultural commodity such as wheat, corn, soybeans, or"; (2) "a species of livestock such as cattle, hogs, sheep, horses, or poultry used or produced in farming operations, or"; (3) "a product of such crop or livestock in its unmanufactured state (such as ginned cotton, wool-clip, maple syrup, milk, and eggs)". The presence of the disjunctive "or" between "soybeans" and "a species of livestock" indicates those two phrases are to be given separate meanings. *See United States v. Woods*, 571 U.S. 31, 45 (2013) ("[o]perative terms are connected by the conjunction 'or' . . . [the] ordinary use [of 'or'] is almost always disjunctive, that is, the words it connects are to 'be given separate meanings[]'"); *Garcia v. United States*, 469 U.S. 70, 73 (1984) ("Canons

13

of construction indicate that terms connected in the disjunctive in this manner be given separate meanings[]").  Accordingly, the literal meaning of the statute separates agricultural commodities "such as wheat, corn, soybeans" from "a species of livestock such as . . . horses" and both from the products of such crops or livestock.  Indeed, had Congress intended for agricultural commodity to encompass both crops and livestock, that intent could have been underscored by merely deleting the word "or" after the word "soybeans." Alternatively, in the third category Congress could have substituted the word "commodity" for "crop or livestock."

Although not binding, we find it telling that the United States Department of Agriculture ("USDA") interprets the FSA in the same way.  The FSA's implementing regulations instruct that farm products "must be specific commodities, species of livestock, and specific products of crops or livestock." 9 C.F.R.[11] § 205.106.  The master list of such farm products includes, "Cattle & calves, goats, horses, hogs, mules, sheep & lambs, other livestock[.]" 9 C.F.R. § 205.206(a).  The master list places no limitation on what the FSA considers to be an applicable "horse."

Finally, we note that the Kentucky legislature has expressed its acceptance of the FSA's application to thoroughbred horses by statutory enactments subsequent to passage of the FSA.  The "Keeneland Rule" provides that a lien on any horse of registered breed whose racing is regulated is

---

[11] Code of Federal Regulations.

extinguished when the horse is sold at public auction to a bona fide purchaser for value. When first enacted in 1976, the statute contained a specific process by which lienholders could protect their lien.[12] When the statute was amended in 2000, the legislature eliminated that process and directed lienholders to the notice provisions of the FSA to protect the interests.[13] The modern notice provision of the Keeneland Rule would be meaningless unless our legislature recognized that the FSA applied to thoroughbreds.

Accordingly, we find that the plain language of the FSA demonstrates that thoroughbred horses are farm products within the meaning of the act. This conclusion is supported by both the federal government's own interpretation of its statute as well as the manner our legislature has interpreted the statute and leaves in place decades of common practice among actors in the equine industry.

Similarly, we hold the FSA also encompass the breeding rights to AMERICAN PHAROAH and LEMOONA. Both the second and third categories of farm products in the FSA are capacious enough to cover the breeding rights of thoroughbreds. The second category includes a species of livestock such as . . . horses used *or produced* in farming operations. The third category includes

---

[12] Lienholders were required to provide "written notice by registered mail of such lien and the amount thereof, the name and address of the debtor and proper identification of the horse subject to lien are given to the organization [in the business of selling such horses] prior to the time of sale." KRS 355.9-307(4) (1976).

[13] In 2000, lienholders were informed their purchases took title to the horse free of any liens, "except to the extent provided by the Federal Food Security Act, 7 U.S.C. sec. 1631." KRS 355.9-320(6).

the "product of such . . . livestock in its unmanufactured state." Although MGG attempts to cast the breeding rights as mere legal abstractions, the reality is that the breeding of thoroughbreds involves very tangible products that easily comport with both common-sense and the FSA's definition of a farm product. The rights to those products are indistinguishable from the products themselves for the purposes of the FSA. Resultingly, the breeding rights are also farm products under the FSA and those Appellees who purchased the rights took free of MGG's security interest.

## C. MGG's claims against Yeomanstown are barred.

Finally, we address the claims against Yeomanstown. Unlike the other Appellees, Yeomanstown was dismissed not because the FSA extinguished the security interest in EL KABEIR, but because MGG's action against Yeomanstown ran afoul of KRS 413.242. The circuit court further found the two-year statute of limitations in KRS 413.125 to apply to the claims, but because the circuit court believed there may be some equitable basis for MGG to assert that the statute of limitations should be tolled, Yeomanstown was dismissed without prejudice. On cross-appeal, the Court of Appeals determined MGG's inspection rights foreclosed equitable tolling of KRS 413.125 and directed the circuit court to enter a new judgment dismissing Yeomanstown with prejudice.

KRS 413.242 creates a special rule for parties seeking to enforce a security interest or lien against an equine interest that has been sold. It provides,

16

> Before a party possessing a security interest or lien against an equine interest that has been sold without the debt to the party being discharged may bring an action against the purchaser or selling agent of the equine interest, the secured party shall pursue a remedy against the debtor to the point where a judgment is rendered on the merits or the suit is dismissed with prejudice.

KRS 413.242. Here, MGG first brought an action against Zayat Stables. Prior to the claims against Zayat Stables resolving, MGG amended its complaint to assert new claims against Appellees, including Yeomanstown. MGG now contends that its addition of Yeomanstown was proper because of a difference between a "claim" and an "action," specifically that while MGG did bring *claims* against Yeomanstown, it did not prematurely bring an *action* in defiance of KRS 413.242.

We find MGG's attempt to parse the difference between "claims" and "actions" in this context to be without merit. Yeomanstown was made a party pursuant to the filing of an amended complaint and summons was issued upon it. Pursuant to CR 3.01, a civil action was commenced against Yeomanstown. That the action grew out of another action initially against another party and was subsequently expanded to include Yeomanstown is immaterial. To find that Yeomanstown had claims asserted against it, but not an action would beggar credulity. Accordingly, we find that the claims asserted against Yeomanstown were synonymous with action for the purposes of KRS 413.242.

Further, we agree with the Court of Appeals that to accept MGG's interpretation would be to effectively render the statute meaningless. "Were we to adopt MGG's theory differentiating between a 'claim' and an 'action,' security interest holders would be empowered to entirely circumvent KRS 413.242 by

17

filing an action which includes claims against both the debtor and purchaser at once." *MGG Inv. Grp. LP*, 2021 WL 5264189, at *6. And even if MGG was to concede that had it included Yeomanstown as a defendant in the original action it would be barred, if we allowed parties to evade KRS 413.242 by simple amendment of the complaint we would create an exception that would swallow the rule. "It is elementary that a Statute should be construed, if possible, so that no part of it is meaningless or ineffectual." *Brooks v. Meyers*, 279 S.W.2d 764, 766 (Ky. 1955).[14]

Having found that the claims against Yeomanstown were properly dismissed pursuant to KRS 413.242, we are left with determining whether MGG may bring those claims again at a later date. No dispute exists that the claims are subject to the two-year statute of limitations in KRS 413.125. At issue is whether the claims should have been dismissed with or without prejudice.

The circuit court in its order dismissing the claims against Yeomanstown without prejudice made three relevant findings: (1) KRS 215.125 applied, (2) the discovery rule was inapplicable, and (3) there may be a basis for the equitable tolling of the limitations period. Upon its review, the Court of appeals

---

[14] MGG contends that application of KRS 413.242 in this way places an undue burden upon a creditor to resolve the initial action against the debtor more quickly than may be prudent or possible. However, we do not intend for this opinion to foreclose the possibility that where a creditor has provided proper notice to a third-party purchaser of equine collateral and brings an action against the debtor within two years, such creditor may be entitled to equitable tolling as to the later action against the purchaser.

18

agreed with findings (1) and (2), but reasoned that MGG's failure to avail itself of its contractual right to inspect the collateral foreclosed equitable tolling.

"Equitable tolling pauses the running of, or tolls, a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Williams v. Hawkins*, 594 S.W.3d 189, 193 (Ky. 2020) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014)). To be entitled to equitable tolling, a litigant must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing,' with those circumstances being beyond the litigant's control." 594 S.W.3d at 194 (quoting *Menominee Indian Tribe v. U.S.*, 577 U.S. 250, 255 (2016)). These are not factors to be considered, but rather are necessary prerequisites for the application of equitable tolling. *Williams*, 594 S.W.3d at 194.

We find that MGG has failed to show that it diligently pursued its rights pursuant to its contract with Zayat Stables. That contract provided MGG with a right to,

> (A) to examine and make copies of and abstracts from [Zayat Stables'] records and books of account, (B) to visit, inspect and examine [Zayat Stables'] Equine Collateral and other properties, (C) to permit Equine Appraisers to visit, inspect and examine [Zayat Stables'] Equine Collateral in connection with Equine Appraisals permitted hereunder, (D) to verify materials, leases, notes, accounts receivable, deposit accounts and [Zayat Stables'] other assets, (E) to conduct audits, physical counts, valuations, appraisals, or examinations and (F) to discuss [Zayat Stables'] affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives[.]

19

*MGG Inv. Grp. LP*, 2021 WL 5264189, at *9. The record indicates that MGG made attempts to speak to members of the Zayat family and to some purchasers of the equine collateral, but did not otherwise exercise its extensive rights to examine Zayat Stables' business activities as provided by the contract. Had MGG done so, it likely would have ascertained that equine collateral was being sold without MGG's consent and legal action could have been taken within the limitation period.[15] Instead, MGG chose to sit on those rights despite increasing suspicion of Zayat Stables.

This Court is cognizant of the unusual situation surrounding this matter. MGG has alleged a pattern of extensive fraudulent dealing by Zayat Stables that occurred over almost the entirety of the two entities' relationship. The actions of Zayat Stables may well constitute an "extraordinary circumstance" that prevented MGG from making its claim against Yeomanstown within the limitation period. Our decision today rests solely on MGG's failure to show that it diligently pursued its contractual rights and should not be read to indicate that fraud akin to that perpetrated by Zayat Stables can never support the equitable tolling of the statute of limitations. Indeed, this Court makes no finding regarding other potential claims related to the agreement between MGG and Zayat Stables.

---

[15] MGG suggests that even had it exercised its inspection rights, it nonetheless could have been thwarted by the simple act of moving the horses to another location. While true, such an act of deception would speak to the second element of equitable tolling, not the first. Whatever impediments to the effectiveness of inspection there may have been, the fact remains that MGG chose not to pursue that right.

20

In sum, we find that the action against Yeomanstown was barred by KRS 413.242 and MGG was required to resolve its action against Zayat Stables prior to bringing a claim against Yeomanstown. Further, we find that MGG failed to diligently pursue the rights granted to it under its contract with Zayat Stables and as such MGG is not entitled to the equitable tolling of the statute of limitations.

## IV.    Conclusion

For the foregoing reasons, the opinion of the Court of Appeals is affirmed in all respects.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Daniel Ernest Hitchcock
William Craig Robertson
Thomas Edwin Joseph Travis
Wyatt Tarrant & Combs, LLP

Brian M. Lipshutz
Kannon K. Shanmugam
Paul Weiss Rifkind Wharton & Garrison, LLP


COUNSEL FOR APPELLEE,
BEMAK N.V., LTD:

Barry Douglas Hunter
Medrith Lee Norman
Frost Brown Todd LLC


COUNSEL FOR APPELLEE,
FLINTSHIRE FARM, LLC:

John Melvin Camenisch, Jr.
Rose Grasch Camenisch Mains, PLLC

Megan R. Holt
Hargrove Firm, LLP

COUNSEL FOR APPELEE,
Hill 'n' Dale Equine Holdings, Inc.:

John Choate Roach
David Trevor Royse
Ransdell Roach & Royse, PLLC


COUNSEL FOR APPELLEE,
LNJ Foxwoods, LLC:
Andrew J. Donovan

Woodson Chapman Hopkins
Stoll Keenon Ogden, PLLC


COUNSEL FOR APPELLEE,
MCMAHON OF SARATOGA
THOROUGHBREDS, LLC.:

Megan K. George
Marshall Reid Hixson
Gregory Paul Parsons
Stites Harbison, PLLC


COUNSEL FOR APPELLEE,
MULL ENTERPRISES LIMITED
D/B/A YEOMANSTOWN STUD:

Thomas Dulaney Bullock
Rachele Taylor Yohe
Bullock & Coffman, LLP


COUNSEL FOR APPELLEE,
ORPENDALE UNLIMITED COMPANY:

Barry Douglas Hunter
Medrith Lee Norman
Frost Brown Todd, LLC

COUNSEL FOR APPELLEE,

THOMAS B. SEARS A/K/A
BRAD SEARS:

John Melvin Camenisch, Jr.
Rose Grasch Camenisch Mains, PLLC

Megan R. Holt
Hargrove Firm LLP


COUNSEL FOR AMICUS CURIAE, KENTUCKY BANKERS
ASSOCIATION:

John T. McGarvey
Matthew Thurman Senn
Morgan Pottinger McGarvey